UNITED STATES of America, Plaintiff–Appellee,

v.

Robert James RITCHIE, Defendant–Appellant.

No. 93–1329.

United States Court of Appeals, Tenth Circuit.

Sept. 21, 1994.

Michael G. Katz, Federal Public Defender, and Stephanie B. Boyer, Asst. Federal Public Defender, Denver, CO, for defendant-appellant.

Henry L. Solano, U.S. Atty., and Kyra Jenner, Asst. U.S. Atty., Denver, CO, for plaintiff-appellee.

Before SEYMOUR, Chief Judge, McKAY, and BALDOCK, Circuit Judges.

SEYMOUR, Chief Judge.

Defendant Robert James Ritchie was convicted on four counts resulting from an armed robbery of cash from an army base in Colorado. A jury convicted Mr. Ritchie of robbery within a special territorial jurisdiction in violation of 18 U.S.C. § 2111, use of a firearm during the commission of a crime of violence in violation of 18 U.S.C. § 924(c), assaulting, resisting, or impeding a military law enforcement officer in violation of 18 U.S.C. §§ 111(a)(1), (b) and 1114, and theft of a motor vehicle in violation of 18 U.S.C. § 2119. Mr. Ritchie asserts on appeal that the district court erred by denying his motion to suppress evidence and by imposing restitution as a part of his sentence. We affirm the denial of the motion to suppress, and we remand to the district court with instructions to vacate the restitution order.[1]

## I.

Most of the facts surrounding the seizure of Mr. Ritchie are not in dispute. Important differences in the parties' versions of events are noted where relevant. On March 29, 1993, an assailant matching the description of Mr. Ritchie and later identified as Mr. Ritchie, robbed Private Rodney Stevens, an army cashier, of $36,000 in cash as Stevens was taking the money from the Army Finance Command Center to another building on the Fort Carson Military Reservation in Fort Carson, Colorado. Wearing the military uniform of a staff-sergeant, grade E–6,[2] and wielding a short-barreled shotgun, the

---

1. The parties have agreed that this case may be submitted for decision on the briefs. *See* Fed. R.App.P. 34(f); 10th Cir.R. 34.1.2. The case is therefore ordered submitted without oral argument.

2. Mr. Ritchie was a former military policeman at Fort Carson with the rank of staff-sergeant, grade E–6.

assailant ordered Stevens and his military police escort, Private David Blonke, to hand over the cash box. Along with the $36,000, the cash box contained ten twenty-dollar bait bills that were paper-clipped together and kept in the side of the cashier's box. The Army had previously recorded the serial number of these bait bills to aid in tracing the bills in the event of robbery or theft.

At gunpoint, the robber ordered Stevens and Blonke to Blonke's nearby police car, obtained the keys, and fled in the car. He then drove a short distance before leaving the police car and entering a two-door gray Datsun with distinctive markings. Blonke ran after the gunman as he fled and was able to identify the license plate number of the Datsun when the robber switched cars. Within hours of the incident, the FBI traced the getaway car through the department of motor vehicles and learned it was a Datsun 240–Z registered to Mr. Ritchie of nearby Colorado Springs.

The FBI immediately began their investigation of Mr. Ritchie, and later that afternoon several agents stopped Mr. Ritchie, driving a different vehicle, in a mall parking lot to ask him some questions.[3] Mr. Ritchie admitted owning the identified Datsun but denied having used it that day. Driving his own vehicle, Mr. Ritchie led the agents back to his residence and showed them his Datsun. It matched the description and the license plate of the getaway car used by the assailant. The FBI agents did not arrest Mr. Ritchie at that time.

The next day FBI Agent Benedict Cruise drove to Denver to obtain search warrants for Mr. Ritchie's residence and car while other agents kept Mr. Ritchie and his house under surveillance. In possession of warrants issued by a U.S. Magistrate Judge in Denver, Agent Cruise drove toward Colorado Springs to execute the warrants. A few minutes prior to Agent Cruise's actual arrival at Mr. Ritchie's home, the agents surveilling the house contacted Agent Cruise by radio and told him that Mr. Ritchie had begun backing out of his garage.[4] Agent Cruise advised them to tell Mr. Ritchie that he was

en route with search warrants and to ask Mr. Ritchie to wait there so he could be present during the search. Before Mr. Ritchie left his premises, several FBI agents blocked his path with their vehicles. Without any guns drawn, the agents asked Mr. Ritchie to exit his vehicle. They performed a quick pat-down search and explained the purpose of the stop. The agents did not formally arrest Mr. Ritchie, and it is undisputed that they did not administer *Miranda* warnings at this time. Mr. Ritchie testified at the suppression hearing that he felt "under apprehension." Rec., supp. vol. I, at 116. He also testified that, when informed that Agent Cruise was en route with search warrants, "I suggested that I would go ahead and sign a waiver, stating that they could search me, the house, my storage area, anything they wanted...." *Id.* Mr. Ritchie did sign a consent to search form.

Agent Cruise arrived on the scene approximately five to ten minutes after the initial detention to find Mr. Ritchie sitting in a lawn chair in his front yard and three or four agents standing in the yard talking. Agent Cruise introduced himself, informed Mr. Ritchie that he had warrants to search the house and car, and told him that the other agents were going to begin the search. He asked Mr. Ritchie if he would come inside the house because Agent Cruise and another agent wanted to talk to him. Agent Cruise testified that Mr. Ritchie's demeanor was "[r]eserved, calm, almost as if he found it kind of humorous." Rec., supp. vol. I, at 85. According to Agent Cruise, Mr. Ritchie said "he'd be happy to" go inside and talk. *Id.*

Once inside, Agent Cruise and Mr. Ritchie sat in lawn chairs facing each other, and another agent sat against the wall to take notes. The other FBI agents searched the house and car. There is some debate as to the exact conversation that followed. Agent Cruise testified that he intended to do a pat-down search for weapons and asked Mr. Ritchie, "What do you have in your pockets?", to see if Mr. Ritchie had any weapons. *Id.* at 87. According to Agent Cruise, before

---

**3.** Mr. Ritchie does not contest on appeal the validity of this stop.

**4.** The record is not perfectly clear, but it appears that Ritchie was not driving the Datsun 240–Z at this time.

he could do the pat-down Mr. Ritchie pulled some U.S. currency out of his front pants pocket and handed it directly to him. Agent Cruise had not expected to receive any currency. He placed the money on his briefcase, which was on the floor, and proceeded to ask Mr. Ritchie some questions. Agent Cruise told Mr. Ritchie about the robbery at Fort Carson, that a person meeting the description of Mr. Ritchie had been identified as the assailant, and that Mr. Ritchie's Datsun had been identified as the getaway car. He asked Mr. Ritchie where he was and what he was doing on the day of the robbery.

Mr. Ritchie's testimony is slightly different. He stated that Agent Cruise "accused [him] of robbing Fort Carson." *Id.* at 117. Mr. Ritchie also testified that Agent Cruise asked him several other questions prior to directly asking, "Do you have any money in your pockets?". *Id.* at 117. Mr. Ritchie testified that when he pulled the money out of his pocket, Agent Cruise took it from him. *Id.* at 118. On cross-examination, however, Mr. Ritchie contradicted himself by agreeing that he gave the money to Agent Cruise "on [his] own free will." *Id.* at 122. It is not disputed that Mr. Ritchie denied involvement in the robbery.

When Agent Cruise asked Mr. Ritchie if he would stand for a physical lineup, he replied that he would not unless he had an attorney present. At that point, Agent Cruise suspected that Mr. Ritchie wanted an attorney and told him the interview was over. Agent Cruise then reached down for the money Mr. Ritchie had given him earlier and compared the serial numbers of the five twenty-dollar bills to the serial numbers of the bait bills from the robbery cash box. The serial numbers of all five bills matched the bait bills. Agent Cruise then formally arrested Mr. Ritchie and gave him verbal *Miranda* warnings. The agents handcuffed Mr. Ritchie and took him into official custody.

## II.

The district court found no Fourth Amendment or *Miranda* violation. It credited the testimony of Agent Cruise and, apparently assuming no arrest occurred until Mr. Ritchie was handcuffed, decided that discovery of the bait bills created probable cause justifying Mr. Ritchie's arrest. Mr. Ritchie contends the FBI violated his Fourth Amendment rights and his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He contends his initial detention in the driveway constituted an arrest, the agents lacked probable cause to make this arrest, and the agents failed to give him the required *Miranda* warnings. Mr. Ritchie argues that *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), is inapplicable on these facts and that, to the extent his actions or statements were voluntary or consensual, exploitation of his prior illegal arrest tainted any consent.

The government maintains that Mr. Ritchie was not "arrested" for Fourth Amendment purposes until after the agents discovered the bait bills. It does not argue that probable cause to arrest existed at the time the agents first detained Mr. Ritchie in his driveway. Rather, the government contends that (1) agents legally detained Mr. Ritchie pursuant to their valid search warrant under the rule in *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), (2) Mr. Ritchie was not subject to custodial interrogation for the purposes of *Miranda* until after he was formally arrested by Agent Cruise, (3) Mr. Ritchie's statements were voluntary regardless of the applicability of *Miranda,* and (4) any error committed below is harmless.

We review the district court's factual findings under the clearly erroneous standard. *United States v. Fernandez,* 18 F.3d 874, 876 (10th Cir.1994). "The ultimate legal determination of reasonableness under the Fourth Amendment is subject to de novo review." *United States v. Perdue,* 8 F.3d 1455, 1462 (10th Cir.1993). After reviewing the record and the parties' arguments, we conclude the FBI detained but did not arrest Mr. Ritchie pursuant to *Summers,* 452 U.S. 692, 101 S.Ct. 2587, and that Mr. Ritchie was not subject to custodial interrogation requiring that he be advised of his rights under *Miranda,* 384 U.S. 436, 86 S.Ct. 1602.

### A.

Initially we address Mr. Ritchie's claim that he was arrested without probable cause

when FBI agents first detained him in his driveway. While it is true that "every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause," *Summers,* 452 U.S. at 700, 101 S.Ct. at 2593, some seizures can be reasonable under the Fourth Amendment without probable cause where the seizure is inherently less intrusive than an arrest, is justified by substantial law enforcement interests, and the police have reasonable articulable suspicion of criminal activity. *Id.* at 697–701, 101 S.Ct. at 2591–93 (citing *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (frisk for weapons); *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (roving border patrols)). We reiterated in *United States v. Maez,* 872 F.2d 1444 (10th Cir.1989), those types of situations which amount to an arrest:

> An arrest or seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen...." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16 [88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889] (1968). *See also Dunaway v. New York,* 442 U.S. 200, 207 n. 6 [99 S.Ct. 2248, 2254 n. 6, 60 L.Ed.2d 824] (1979). A show "of official authority such that 'a reasonable person would have believed he was not free to leave'" indicates that an arrest has occurred. *Florida v. Royer,* 460 U.S. 491, 502 [103 S.Ct. 1319, 1326, 75 L.Ed.2d 229] (1983) (plurality opinion) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554 [100 S.Ct. 1870, 1877, 64 L.Ed.2d 497] (1980) (opinion of Justice Stewart joined by Justice Rehnquist)). "Examples of circumstances that might indicate a seizure, even when the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer ... or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall,* 446 U.S. at 554 [100 S.Ct. at 1877]. "[T]he determination of whether an arrest has occurred is not dependent on whether the citizen is formally placed under arrest...." *United States v. Hatfield,* 815 F.2d 1068, 1071 (6th Cir.

1987) (quoting *United States v. Hardnett,* 804 F.2d 353, 356 (6th Cir.1986)).

*Id.* at 1450 (citations omitted).

■ The facts here show that the agents never held Mr. Ritchie at gunpoint, that they handcuffed him only after formal arrest, that no agents used physical force in his detention apart from the pat-down search for weapons, and that they did not otherwise engage in strong arm tactics. While the agents did block his exit from the driveway, they did so to inform him that a warrant to search his house was on the way and to ask him if he would stay while the search was conducted. Nothing in the facts suggests the FBI agents acted improperly, abusively, coercively, or in an overtly threatening manner. On the contrary, Mr. Ritchie himself admits that he suggested he sign a consent to search form at the very inception of the detention. Agent Cruise introduced himself when he arrived on the scene, and Mr. Ritchie appeared "[r]eserved, calm, almost as if he found it kind of humorous." Rec., supp. vol. I, at 85. When Agent Cruise asked if they could go inside to talk, Mr. Ritchie said "he'd be happy to." *Id.* As for the conversation once Mr. Ritchie and Agent Cruise were inside the house, the district court specifically found Agent Cruise's version of events more credible. We are especially deferential to findings of fact based on credibility, *Sanchez v. Bond,* 875 F.2d 1488, 1496 (10th Cir.1989) (citing *Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985)), and we find no basis for accepting Mr. Ritchie's version of events over that of Agent Cruise. Thus, even though the agents detained Mr. Ritchie at his premises while conducting the search, the facts before us do not show that they restrained him to a degree associated with formal arrest, especially when we consider *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587.

Faced with a factual situation comparable to ours today, the Supreme Court in *Summers* expanded the realm of detentions short of arrest that may be based on less than probable cause. There, the Detroit police detained an individual as he was descending the front steps of a house for which they had a warrant to search for narcotics. The police

found contraband during the search of the house. After ascertaining that the individual owned the house, they arrested him and found heroin in his pocket upon a search of his person. The State charged the suspect with possession of the heroin found on his person, and he moved to suppress the evidence, claiming the search of the house and his person violated the Fourth Amendment.

In deciding whether an arrest had occurred, the Court examined both the character of the intrusion and its justifications. The Court held that the detention during the search of the premises was certainly less intrusive than the search itself, and "that most citizens—unless they intend flight to avoid arrest—would elect to remain in order to observe the search of their possessions." *Id.* at 701, 101 S.Ct. at 2593. The Court stated that because the detention occurred in respondents' own residence, "it could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station." *Id.* at 702, 101 S.Ct. at 2594. Finally, the Court suggested that "the type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention." *Id.*

Assessing the justifications for detention of an occupant of premises being searched pursuant to a valid warrant, the Court held that both law enforcement interests and the nature of the articulable facts supporting the detention are relevant. The Court found that such detentions further three law enforcement interests: 1) preventing flight of the individual if incriminating evidence is found; 2) minimizing the risk of harm to the police; and 3) facilitating orderly completion of the search. *Id.* at 702–03, 101 S.Ct. at 2594. The Court held that the existence of a search warrant for contraband, issued by a neutral magistrate and based on probable cause, creates articulable and individualized suspicion of criminal activity, and "[t]he connection of an occupant to that home gives the

police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." *Id.* at 703–04, 101 S.Ct. at 2594–95.

The Court concluded by creating a standardized rule that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Id.* at 705, 101 S.Ct. at 2595 (footnote omitted). The Court's holding in *Summers* does not require the police to evaluate on an ad hoc basis the circumstances surrounding the execution of the warrant each and every time they wish to detain an occupant of the place to be searched. *Id.* at 705 n. 19, 101 S.Ct. at 2595 n. 19. Rather, the "police may *always* detain persons found at the premises named in a search warrant, provided (i) the warrant authorizes a 'search for contraband' and (ii) the persons detained are 'occupants.'" 2 W. La-Fave, *Search and Seizure* § 4.9(e), at 309 (2d ed. 1987) (emphasis in original) (hereinafter LaFave, *Search & Seizure* ).[5]

Attempting to avoid the application of *Summers* to this case, Mr. Ritchie argues that 1) the FBI agents were not in physical possession of the warrant at the time they first detained him, 2) the warrant authorized a search for evidence, not "contraband" as required by *Summers,* and 3) the specific facts of this case make the law enforcement interests and the character of the detention distinguishable from the situation in *Summers.* We address each of these arguments in turn.

■ First, while it is true that the FBI agents who first detained Mr. Ritchie in his driveway did not have actual physical possession of the warrant, they were aware that a magistrate had issued a warrant and that Agent Cruise was en route to the premises with that warrant. It is undisputed that Agent Cruise arrived only five to ten minutes after the agents first detained Mr. Ritchie. As the Court noted in *Summers,* the significance of the search warrant in these cases is

---

5. The Court did state in a footnote, without elaborating, that "special circumstances, or possibly a prolonged detention" might take a particular

detention outside the scope of a valid *Summers*-type detention.

that it gives "the police officer[s] an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." *Id.* at 704, 101 S.Ct. at 2595. The detaining agents here knew that a neutral party had issued a search warrant for Mr. Ritchie's premises, thus giving them reasonable suspicion to detain him. The fact that they did not yet have actual possession of the warrant is not enough to defeat the application of *Summers,* especially where another agent was only minutes away, en route with the warrant.[6]

■ Second, Mr. Ritchie argues that *Summers* is only applicable to search warrants for "contraband," and that because the warrant in this case authorized a search for evidence, such as clothing, stolen currency, and the cash box, *Summers* does not apply. We disagree. In a footnote to its general rule, the Court expressly declined to decide whether a detention pursuant to a search warrant "would be justified if the search warrant merely authorized a search for evidence." 452 U.S. at 705 n. 20, 101 S.Ct. at 2595 n. 20. The Court referenced its decision in *Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). *Zurcher* involved the validity of third-party searches, where there is "probable cause to believe that fruits, instrumentalities, or other evidence of crime is located on identified property but [there is no] probable cause to believe that the owner or possessor of the property is himself implicated in the crime." *Id.* at 553, 98 S.Ct. at 1975 (student newspaper offices contained photographs, taken by newspaper staffers, that implicated other individuals in assault on police at student demonstration). Thus, footnote 20 in *Summers* stems from a concern that in some instances the existence of a warrant based on probable cause would not give the police "an easily identifiable basis for determining that suspi-

cion of criminal activity justifies a detention of [the] occupant." *Summers,* 452 U.S. at 704, 101 S.Ct. at 2595.

This concern is not present here. Our facts do not involve a third-party search, and Mr. Ritchie was directly implicated in the crime being investigated. Indeed, only hours after the robbery, the FBI had traced the getaway car to Mr. Ritchie and had actually seen the car in Mr. Ritchie's garage. Under these circumstances, the existence of the warrant to search Mr. Ritchie's house and car for evidence, such as the stolen cash, clothes, and the cash box, gave the FBI ample reason to suspect Mr. Ritchie of criminal activity, thereby justifying the detention under the *Summers* rationale. To the extent the *Summers* Court restricted its holding to warrants authorizing the search for "contraband," we think the term "contraband" is broad enough to encompass stolen property. *See* LaFave, *Search & Seizure,* § 4.9(e), at 310. "Thus *Summers* covers, for example, a search warrant for proscribed drugs or a search warrant for stolen property." *Id.* We hold that Mr. Ritchie cannot escape the application of *Summers* solely because the warrant authorized a search for property stolen in a robbery in which he was directly implicated.

■ Finally, Mr. Ritchie attempts to avoid the application of *Summers* by asserting that this case does not invoke the law enforcement interests stressed in *Summers* and that his detention was more intrusive than in *Summers.* As we noted above, *Summers* announced a general rule that applies absent "special circumstances, or possibly a prolonged detention, [that] might lead to a different conclusion in an unusual case." 452 U.S. at 705 n. 21, 101 S.Ct. at 2595 n. 21. Under the Court's general rule, "the officer is not required to evaluate either the quan-

6. Generally, requirements imposed by statute or court rule concerning the execution of search warrants, such as exhibiting a copy of the warrant at the premises, are considered ministerial and "are not deemed to flow so directly from the Fourth Amendment's proscription upon unreasonable searches that failure to abide by them compels exclusion of evidence obtained in execution of a search warrant." LaFave, *Search & Seizure* § 4.12, at 358–59. *See also United States v. Hepperle,* 810 F.2d 836, 839 (8th Cir.1987)

("[L]aw enforcement officials are not constitutionally required to present a copy of the search warrant prior to commencing a search, so long as the previously issued warrant is presented before the officers vacate the premises."); *United States v. Bonner,* 808 F.2d 864, 869 (1st Cir.1986) (even though officers not in actual physical possession of warrant at commencement of search, search still valid as neither Fourth Amendment nor federal rule 41(d) requires exhibition of warrant at outset of warrant execution).

tum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." *Id.* at 705 n. 19, 101 S.Ct. at 2595 n. 19. Accordingly, the absence of a particular law enforcement interest in a given situation will not automatically defeat the application of *Summers*. *See, e.g., id.* at 702, 101 S.Ct. at 2594 (noting that "no special danger to the police is suggested by the evidence in this record," but recognizing that narcotics arrests generally are prone to "sudden violence or frantic efforts to conceal or destroy evidence"). However, to the extent Mr. Ritchie is arguing that the facts surrounding his detention transform this into a "unusual case" beyond the reach of *Summers*, we examine his claims.

Mr. Ritchie suggests the law enforcement interests announced in *Summers* are somehow less important here, but we are not convinced. Indeed, given the intense scrutiny of Mr. Ritchie as a suspect and his possession of a short-barrelled shotgun during the robbery, we think the law enforcement interest in preventing both flight of the suspect and the threat of harm to officers is as great here as in *Summers*. The fact that Mr. Ritchie was leaving the scene when stopped does not mean he posed no threat to officers executing a warrant. The suspect in *Summers* was also leaving the scene, and the Court upheld his detention and broadly stated that the risk of harm to both occupants and police "is minimized if the officers routinely exercise unquestioned command of the situation." *Id.* at 702–03, 101 S.Ct. at 2594. Preventing a suspect from leaving the premises of a place to be searched reduces the potential for harm because it ensures that a suspect will not return to the premises later "and try to forcibly thwart execution of the warrant." LaFave, *Search & Seizure* § 4.9(e), at 306.

Similarly, we find no special circumstances showing that the intrusiveness of Mr. Ritchie's detention was sufficiently severe to preclude application of *Summers*. Mr. Ritchie does not argue that the agents unduly prolonged his detention, and the record shows that the agents never drew their guns

and did not handcuff Mr. Ritchie until after they discovered the bait bills. In addition, the detention of Mr. Ritchie for approximately five to ten minutes in his yard and then for some minutes inside his home [7] "involve[d] neither the inconvenience nor the indignity associated with a compelled visit to the police station." *Summers*, 452 U.S. at 702, 101 S.Ct. at 2594. Mr. Ritchie suggests that his seizure as he was backing out his driveway is sufficient to distinguish this from *Summers*, where the police detained the suspect as he was walking down the front steps of his house. We do not find this distinction significant where, as here, Mr. Ritchie had not left his premises when stopped.

Mr. Ritchie also points to the statement in *Summers* that "the type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention." *Summers*, 452 U.S. at 701–02, 101 S.Ct. at 2594. We are not persuaded that the circumstances of this case show any exploitation, much less the degree of exploitation that would be necessary to place this case beyond the reach of *Summers*. After hearing testimony, the district court chose to credit Agent Cruise's version of events, *i.e.*, that the agent asked Mr. Ritchie what he had in his pockets as a precursor to doing a patdown search and that Mr. Ritchie surprised him by pulling out the money. Supp. Aplt.App., vol. II, at 26. As we have pointed out, the agents did not hold Mr. Ritchie at gunpoint or handcuff him until after the discovery of the baited bills.

In summary, the rule announced in *Summers* and the rationale behind that rule apply to Mr. Ritchie's detention, and he has not persuaded us that the circumstances surrounding his detention make *Summers* inapplicable.[8] Mr. Ritchie was not arrested, but was properly detained pursuant to a valid warrant to search his premises.

---

7. The record does not clearly reveal the duration of the detention inside Mr. Ritchie's house, but Mr. Ritchie does not argue that was excessive.

8. Because we hold that the agents legally detained Mr. Ritchie under *Summers*, we need not address his claim that his prior illegal arrest tainted his voluntary actions.

### B.

Mr. Ritchie claims the FBI agents violated his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), by questioning him without giving the requisite warnings. The district court found no violation of *Miranda* because Mr. Ritchie received *Miranda* warnings as soon as Agent Cruise discovered the bait bills and formally arrested him. While the district court did "suggest that the better practice is to give *Miranda* warnings right away," supp. aplt. app., vol. II, at 27, it made no explicit findings of fact concerning whether the agents subjected Mr. Ritchie to "custodial interrogation" for the purposes of *Miranda.* Nevertheless, we will "uphold the trial court's ruling insofar as it applies to the facts if there is any reasonable view of the evidence to support it." *United States v. Griffin,* 7 F.3d 1512, 1516 (10th Cir.1993). We "review the evidence in the light most favorable to the government." *United States v. Short,* 947 F.2d 1445, 1449 (10th Cir.1991).

"[T]wo requirements must be met before *Miranda* is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'" *Perdue,* 8 F.3d at 1463. We can dispose of Mr. Ritchie's *Miranda* claim on the first element alone. A person is "in custody" for the purposes of *Miranda* if he "has been deprived of his freedom of action in any significant way," *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612, or his freedom of action has been curtailed to a "degree associated with a formal arrest," *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam). There are some instances where police detention and questioning of criminal suspects do not amount to custodial interrogation requiring *Miranda* warnings. Traditionally *Miranda* warnings are not required in stops pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), because "the typical police-citizen encounter envisioned by the Court in *Terry* usually involves no more than a very brief detention without the aid of weapons or handcuffs." *Perdue,* 8 F.3d at 1464. However, where the police find it necessary to employ an amount of force in a *Terry* stop that is beyond the ordinary, they can create "the 'custodial' situation envisioned by *Miranda* and its progeny." *Id.* We thus clarified in *Perdue* that *Miranda* warnings may be required before a suspect is actually arrested.

Examining the totality of the circumstances here, we are not convinced that Mr. Ritchie was "in custody" for the purposes of *Miranda.* It is true that the agents detained Mr. Ritchie pursuant to *Summers,* but as we noted above, they never held him at gunpoint, handcuffed him, or otherwise used force or threat of force. *Compare Perdue,* 8 F.3d at 1464 (suspect in "custody" and *Miranda* warnings required in *Terry* stop where police forced suspect out of car at gunpoint and held him and his pregnant fiance at gunpoint face-down on ground during questioning while police helicopters hovered overhead). Significantly, Mr. Ritchie's detention occurred on his own premises, primarily inside the living room of his own home. "[C]ourts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings," such as the suspect's home. 1 W. LaFave, *Criminal Procedure* § 6.6(e), at 496 (1984 & 1991 Supp.) (citing cases) (emphasis added); *see Beckwith v. United States,* 425 U.S. 341, 347, 96 S.Ct. 1612, 1616–17, 48 L.Ed.2d 1 (1976) (although suspect was "focus" of IRS investigation, questioning of suspect in his home did not amount to "custody" for purposes of *Miranda* ).

While there were several FBI agents at Mr. Ritchie's home, only Agent Cruise and one other agent stayed with Mr. Ritchie in the living room while the other agents conducted the search. Agent Cruise, whom the court chose to believe, testified that Mr. Ritchie willingly entered the house to talk to the agent during the search. Nothing in the record indicates that the agents threatened or coerced Mr. Ritchie during the discussion. As soon as Mr. Ritchie referred to a lawyer, Agent Cruise ceased questioning him.

In addition to these facts strongly suggesting Mr. Ritchie was not "in custody," the Court's decision in *Summers* supports the conclusion we reach. The Court explicitly recognized the distinction between traditional arrests and detentions pursuant to valid search warrants. The *Miranda* "in custody"

question was not directly before the Court in *Summers,* but in addressing the Fourth Amendment issue the Court did state: "In sharp contrast to the *custodial interrogation* in *Dunaway,* the detention of this respondent was 'substantially less intrusive' than an arrest." *Summers,* 452 U.S. at 702, 101 S.Ct. at 2594 (emphasis added). The facts of the present case are materially indistinguishable from those in *Summers,* and we are therefore not persuaded that Mr. Ritchie was "in custody" for *Miranda* purposes.

"The determination of custody, from an examination of the totality of the circumstances, is necessarily fact intensive. In the past, we have avoided hard line rules to govern this analysis, and our opinion today should not be interpreted as an exhaustive pronouncement," *Griffin,* 7 F.3d at 1518, that the procedural protections required by *Miranda* are never implicated when a person is detained pursuant to *Summers.* While we hold that Mr. Ritchie was not "in custody" on these facts, we agree with the district court that the better practice is to give *Miranda* warnings immediately.

### III.

The last issue in the case is the district court's order that Mr. Ritchie pay $36,000 in restitution. Mr. Ritchie argues that the imposition of restitution was clearly erroneous because the record demonstrated he had no ability to pay. We need not address the merits of Mr. Ritchie's claim because, due to developments subsequent to the date of Mr. Ritchie's sentencing, the government no longer objects to vacating the restitution order. Because both parties agree, we remand this case for the sole purpose of vacating the restitution order.

The district court's denial of the motion to suppress is AFFIRMED, and the case is remanded to the district court to VACATE the restitution order.