People v Ellison (2004 NY Slip Op 24083)

People v Ellison

2004 NY Slip Op 24083 [4 Misc 3d 319]

March 16, 2004

Supreme Court, Monroe County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Monday, November 15, 2004

[*1]
The People of the State of New York, Plaintiff,
v
Roy Ellison, Jr., Defendant.
Supreme Court, Monroe County, March 16, 2004

APPEARANCES OF COUNSEL

Edward J. Nowak, Public Defender (Daniel P. Medved of counsel), for defendant. Michael C. Green, District Attorney (Peter C. Lewis of counsel), for plaintiff.

{**4 Misc 3d at 320} OPINION OF THE COURT

Kenneth R. Fisher, J. 
Defendant moves to suppress cocaine, glassine baggies, personal items, including a bag, a photo id, and pieces of mail addressed to the defendant showing ownership or tenancy of the apartment, all of which were seized pursuant to a warrant targeting apartment No. 1, 444 West Main Street, Rochester, New York. The defendant's primary contention is that the police improperly entered the apartment and conducted a search therein prior to the procurement of a search warrant. He also moves to suppress the identification testimony of Officer Michael Houlihan, who made a confirmatory identification of the defendant while in the apartment shortly before the warrant was issued. The People opposed the defendant's position and a hearing was conducted on January 30, 2004.

Factual Background

The first witness called by the People was Officer Michael Houlihan who testified that at approximately 10:30 p.m. on May 29, 2003, in the vicinity of 444 West Main Street in the City of Rochester he participated in a controlled cocaine buy with Officer Rebecca LeWare. Houlihan testified that, while at the corner of West Main Street and Canal Street, he noticed a man standing in front of 444 West Main Street. Houlihan pulled over to Canal Street and put his fingers up to his mouth in a smoking motion. The man nodded and waved him over. Houlihan left his vehicle and went over to the man, who was later identified as Kenneth Johnson.
Houlihan testified that he asked Johnson if he had any "rock," meaning cocaine, and Johnson responded that he could get him some. Johnson asked him how much he wanted. Houlihan responded that he wanted $40 worth. When Houlihan refused to give Johnson the money, Johnson agreed to take him to where the cocaine could be bought.{**4 Misc 3d at 321}
At that point, according to Houlihan, they went to the front of 444 West Main Street. Johnson rang the doorbell. In response, a man came out of the first apartment on the right, walked down the stairs, and opened the outside door in order to let them in. Then Houlihan handed Johnson the $40 and they followed the man up the stairs and into apartment No. 1. Officer Houlihan identified this second man as the defendant, Roy Ellison, Jr. After they entered the apartment, Ellison closed the door behind them and locked it. Next, Johnson indicated that "he wanted four bags." Ellison asked Houlihan if he was a cop. After Houlihan said, "No," Ellison pointed to another male who was sitting on a couch in front of a small coffee table, codefendant, Stephen Henry. They walked over to Henry, who told Johnson to pick what he wanted from the display on the coffee table. Johnson picked four clear plastic ziplock bags. Houlihan testified that there were 20 to 30 of these clear plastic bags on the table and they all contained an off-white substance that appeared to be cocaine. Houlihan testified that Johnson [*2]gave Ellison the $40 before he was allowed to remove the baggies from the table.
After picking up the four baggies, Houlihan and Johnson left the apartment, and walked over to the corner. Houlihan asked Johnson for the cocaine and Johnson gave him three bags, keeping one for himself as payment for his services. Johnson told Houlihan that he could get him more at some other time. Houlihan got into the car with LeWare as Johnson walked over across Canal Street. Houlihan announced over his recorder that the deal was completed and a marked squad car pulled up and took Johnson into custody before he even completed crossing Canal Street. At that point, Houlihan went directly around the corner and spoke with his supervisor, Sergeant Riley.
Houlihan told Riley what had transpired, including the fact that additional cocaine was left in the apartment. Riley decided that a tactical unit would "breach and hold" the subject apartment while Houlihan obtained a search warrant. Houlihan told Riley that he would go back to the public safety building to prepare a warrant and application for seizures of cocaine, personal paperwork relating to ownership, and drug paraphernalia. Houlihan testified that he went back to the public safety building, and as he was typing the application and search warrant, he realized that he had not confirmed for the arresting officers the identification of the people he saw in the apartment (Henry and Ellison), a usual police procedure in the circumstances.{**4 Misc 3d at 322} Houlihan went back to 444 West Main Street and made the identifications. He testified that the identifications took place in the apartment at approximately 11:52 p.m. Houlihan indicated that while he was in the apartment making his identifications, none of the officers there were engaged in any search.
Next, Houlihan presented the application to City Court Judge Lindley, who duly signed and issued it at 12:10 a.m. on May 30th. Houlihan testified that he proceeded back to 444 West Main Street after calling Riley to notify him that he had a signed warrant in hand. The search warrant contained language which allowed for a search of the entire apartment for the purpose of obtaining cocaine, money, personal "paperwork" as well as items commonly used to prepare, package and sell cocaine or other controlled substances.
When Houlihan arrived at the apartment, he searched the kitchen area. During that search, he stated that he found inside a Newport cigarette packet five small, translucent, green bags containing a solid off-white substance which appeared to be cocaine. He also found an additional packet on a separate suspect, James Williams. Houlihan did not personally seize any other items. The People did not call the other officers who participated in the search to establish the timing in relation to Houlihan's arrival at the premises with the warrant. But it was clear from the testimony that the search team began their work before Houlihan got there.
Sergeant Anthony Perez supervised the arrest team and monitored the movements and conversations of Houlihan during the cocaine buy. Perez testified that, when Houlihan's signal came, he took Johnson into custody. According to Perez, the decision to "breach and hold" the apartment was based in part on the worry that the operation might have been compromised by the apprehension of Johnson within view of the occupants of apartment No. 1. The apartment was breached at 10:45 p.m. by the use of a battering ram. Perez and four of his officers entered.
Once inside, they secured the individuals found there. Ellison was found in the living area and Henry was found standing over the sink in the bathroom. No search began at that point. Perez testified that he was present and could hear Houlihan inform Sergeant Riley that the search warrant had been procured. It was only at that time that any search began. Perez testified that neither himself nor his officers engaged in the search, they simply "moved people" out so that Sergeant Riley's personnel could {**4 Misc 3d at 323}conduct the search. Perez maintained that the search was held off until he was aware that the search warrant was signed and on its way with Houlihan.
Sergeant Riley testified that he was in charge of the operation that night; that he provided Houlihan and LeWare with $100 in prerecorded bills; that he monitored Houlihan's undercover buy; that there was a concern that the cocaine in the apartment would be destroyed or moved if the occupants had watched their companion, Johnson, being arrested; and that therefore the breach and hold was necessary.
[*3]
Riley confirmed Houlihan's account of his discussion of the intended contents of the warrant application and the terms of the warrant itself. Riley understood that Houlihan would apply for a warrant for "cocaine in Apartment #1, 444 West Main Street," including seizure of "cocaine, cash," documents and other related items. Riley testified that he went back to his office, primarily to change, and returned to the apartment in approximately one-half hour. No search was then taking place; the officers were waiting for Houlihan to call. Eventually, Houlihan called and told him that the judge had signed it and that he was on his way to the scene with the warrant. Riley testified that, at that point, he gave the order that the search could begin.
Houlihan returned to the apartment about 15 minutes after Riley gave the officers on-site permission to search. In regard to the buy money, Riley testified that Officer Bernabei located it under the sink where it was photographed and subsequently removed by Riley. Riley also testified that during the course of the search, Bernabei found mail addressed to Ellison as well as a photo ID of him. LeWare found empty baggies. Neither Sergeant Riley nor Officer Houlihan testified when the money, mail, photo ID, or drug paraphernalia were seized in relation to when Houlihan arrived at the premises with the signed search warrant.
The defendant did not present any evidence in his own behalf and proofs were closed.
Both counsel made oral argument at that time. Counsel for the defendant submitted that there were two basic issues before the court; one was whether the entry for the purpose of a breach and hold was lawful, and secondly, whether the search, which commenced prior to the search warrant's arrival on site, was lawful. Counsel argues that, even if case law allowed a breach and hold of the premises to await a search warrant, the "sole purpose" of the breach and hold in this case was to obtain the confirmatory {**4 Misc 3d at 324}identification of Houlihan. Defendant concedes, however, that the police could have obtained a search warrant without the entry and identification. Next, counsel argues that the items seized during the search should be suppressed because the actual search took place before Houlihan arrived at the apartment with the search warrant in hand. In support of this argument, counsel cited People v Carson (99 AD2d 664 [4th Dept 1984]) and People v Okun (135 AD2d 1064 [3d Dept 1987]).
In response to the defendant's arguments, the People presented proof that the initial warrantless entry was permissible because the occupants would have been able to witness the arrest of Johnson, and that they would, therefore, have anticipated an immediate search for drugs and had an opportunity to destroy or conceal them. Concerning the issue whether the items should be suppressed because the search commenced prematurely, the People contend that, because Riley knew the warrant had been signed and was on its way, because he knew the items intended to be targeted for seizure in the search warrant, and because the search warrant arrived on site as the search was being conducted, suppression is not required.

A. The Breach and Entry

Defendant moves to suppress Houlihan's identification testimony, and the evidence seized pursuant to the warrant, on the ground that they were the direct by-product of an illegal warrantless entry into the apartment prior to the time the warrant was issued, in violation of Payton v New York (445 US 573 [1980]). Although the People implicitly acknowledged the impropriety of the warrantless entry when they interposed in their answering papers the sole argument that the evidence was admissible under the independent source rule as applied in People v Arnau (58 NY2d 27 [1982]), by their presentation of evidence that the so-called breach and hold was made necessary by the arrest of Johnson in full view of the apartment's occupants, the People now contend that exigent circumstances justified the entry to prevent the destruction of evidence. Indeed, after the hearing, defense counsel asserted in oral argument that Arnau was authority which permitted the warrantless entry and "hold" in these circumstances until the search warrant was obtained. (H.M. at 76 ["I'm cognizant of caselaw that does allow a breach and hold for similar circumstances"].) Defendant sought to distinguish Arnau on the ground that the police used the "hold" procedure, i.e., the detention of the occupants (one of whom was the defendant), as an excuse to obtain other {**4 Misc 3d at 325}evidence, specifically the confirmatory identification provided by Houlihan just before he went to Judge Lindley for [*4]issuance of the warrant. (H.M. at 8, 75-78.) The People maintain that the evidence seized pursuant to the warrant should be admitted under the independent source rule articulated in Arnau.
Despite the parties' evident current position, Arnau presupposed that the warrantless entry in that case was unlawful (Arnau, 58 NY2d at 34 ["unlawful act of securing an apartment"]), and determined only that evidence "seized pursuant to a valid search warrant based solely on information obtained prior to and independent of the illegal entry" should not be suppressed. (Id., 58 NY2d at 33.) But defense counsel is correct that the warrantless entry and relatively brief detention of the occupants pending issuance of the warrant is permissible in these circumstances to prevent destruction of evidence following the arrest of Johnson in plain view of the apartment's occupants.[FN1]

Arnau was decided in the wake of the Second Circuit's decision in United States v Segura (663 F2d 411 [2d Cir 1981]) and before the Supreme Court affirmed that case in sharply divided opinions concerning whether the entry for the purpose of preserving easily destructible evidence is an unreasonable "seizure" absent exigent circumstances. (Segura v United States, 468 US 796 [1984]; see discussion of Segura in 3 W.R. LaFave, Search and Seizure § 6.5 [c], at 365-367 [3d ed 1986].) While the Court was unanimous on the application of the independent source doctrine to these circumstances, it left open the question whether a warrantless entry to preserve evidence was an unreasonable seizure; the Court expressly declined to reach the question whether exigent circumstances were present because the government did not seek review of that issue. (Segura, 468 US at 804.){**4 Misc 3d at 326}
Those issues were treated more recently in Illinois v McArthur (531 US 326 [2001]). In that case, the circumstances were analogous to those here. Occupants of the apartment, which the police had abundant probable cause to believe contained illegal drugs, could readily have seen the interaction of the police and a departing occupant, the defendant's wife, giving rise to the "reasonabl[e] conclu[sion]" that those remaining within, "consequently suspecting an imminent search, would, if given the chance, get rid of the drugs fast." (Id., 531 US at 332.) The Court held, "We have found no case in which this Court has held unlawful a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time." (Id., 531 US at 334.)
The problem in this case is that the restriction imposed in McArthur was the detention of the suspect just outside the home, and the securing of the premises from outside (including [*5]preventing the suspect's re-entry),[FN2]

whereas in this case the police actually entered. Nevertheless, the Court held that the case "involve[d] a plausible claim of specially pressing or urgent law enforcement need, i.e., 'exigent circumstances' " (id., 531 US at 331), a finding that might also justify a warrantless entry into the home if the following test is met: 
"First, . . . probable cause to believe that [the premises] contain[s] evidence of a crime and contraband, namely, unlawful drugs . . .
"Second, . . . good reason to fear that, unless restrained [the owner] would destroy the drugs before they [the police] could return with a warrant . . . 
"Third, the police ma[k]e reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy . . . [and] 
"Fourth, the police impos[e] the restraint for a limited period of time." (Id., 531 US at 331-333; see also, id. at 337.)[FN3]{**4 Misc 3d at 327}

To be sure, the intrusion here was of a different kind and scope, involving entry into the premises without a warrant (McArthur, 531 US at 336 [noting the heightened Fourth Amendment interests when entry into the home for arrest and search is made], citing Payton, 445 US at 585). But here, the officers only made entry to preserve the status quo, because the occupants were still there, and they did so without searching and without effecting a full arrest of the occupants. As Justice Souter stated in his concurring opinion in McArthur, if McArthur had remained in his home after the police interacted with his wife outside, the "risk [of destruction in anticipation of a warrant] would have justified the police in entering McArthur's trailer promptly to make a lawful, warrantless search." (Id., 531 US at 337.) It was only because McArthur "stepped outside and left the trailer uninhabited [that] the risk abated" making immediate entry unreasonable as long as he remained outside. (Id. at 337-338 [Souter, J., concurring].) In this case, because the occupants of the apartment remained inside, exigent circumstances justified the entry and detention of the occupants pending [*6]issuance of a warrant.[FN4]

"The law can hardly raise incentives to obtain a warrant without giving the police a fair chance to take their probable cause to a magistrate and get one." (Id., 531 {**4 Misc 3d at 328}US at 338 [Souter, J., concurring].) In this case, the police reasonably believed that they would not have had their "fair chance" if the destruction of evidence was not prevented by the only means available, entry into the apartment and a restraint of the occupants pending issuance of the warrant.
Accordingly, the motion to suppress the evidence seized after issuance of the warrant, insofar as it is based on the warrantless entry into the apartment, is denied. So too is the motion to suppress the out-of-court identification of defendant by Houlihan in the apartment just before he presented the warrant to Judge Lindley. For the reasons stated above, there was no Payton violation, and the confirmatory identification otherwise satisfied due process considerations. The case of People v Gethers (86 NY2d 159 [1995]), decided in the context of an illegal arrest (which is not present here) is distinguished.
That leaves for consideration defendant's argument that the evidence should be suppressed upon the independent ground that the execution of the search warrant violated the Fourth Amendment because it began prior to Houlihan's arrival at the apartment with the warrant in hand.

B. The Timing of the Search

Defendant contends that suppression is required because the police began searching the apartment before arrival of the warrant on site, even as to items seized after he came in with the warrant. While there are two cases which held that evidence seized after a warrant has been signed, but before it has arrived at the place to be searched, should be suppressed (People v Okun, 135 AD2d 1064 [3d Dept 1987]; People v Carson, 99 AD2d 664 [4th Dept 1984]), Fourth Amendment jurisprudence in the Supreme Court has fully abrogated them. There is as yet no separate state constitutional rule in this area. (People v Martinez, 187 AD2d 992 [4th Dept 1992].)
It must be stressed at the outset that defendant does not contend, nor could he on this record, that the warrant was not properly issued, or that it failed in any respect to comply with the Fourth Amendment and CPL article 690. Nor does defendant contend that, other than in timing in relation to Houlihan's arrival at the apartment with warrant in hand, the manner of search was otherwise unreasonable (or exceeded the authorization in the warrant). Nor does defendant contend that the {**4 Misc 3d at 329}items ultimately seized were not particularly described in the warrant. Nor, even, does defendant, who was present, contend that he requested to see the warrant before the search started. (CPL 690.50 [1].) He does contend, however, that suppression of all the items seized, even though we know that the cocaine, for example, was not seized until Houlihan got there (because it was Houlihan who found the cocaine), is required simply because the search started before the warrant arrived at the apartment. This result is not required by the Fourth Amendment, nor by CPL 690.50.
"The Fourth Amendment says nothing specific about formalities in exercising a warrant's authorization, speaking to the manner of searching as well as to the legitimacy of searching at all simply in terms of the right to be 'secure . . . against unreasonable searches and seizures.' " ([*7]United States v Banks, 540 US 31, 35 [2003], quoting US Const Amend IV.) That general statement was given application in the context at issue here when the Supreme Court said three weeks ago "that neither the Fourth Amendment nor Rule 41 of the Federal Rules of Criminal Procedure requires the executing officer to serve the warrant on the owner before commencing the search." (Groh v Ramirez, 540 US 551,  n 5, 124 S Ct 1284, 1292 n 5 [2004];[FN5]

see also, Katz v United States, 389 US 347, 355 n 16 [1967] [rule 41 "does not invariably require that this be done before the search takes place"]; United States v Stefonek, 179 F3d 1030, 1034 [7th Cir 1999] [Posner, J.] ["absence of a constitutional requirement that the warrant be exhibited at the outset of the search, or indeed until the search has ended"]; United States v Ritchie, 35 F3d 1477, 1483 n 6 [10th Cir 1994] [such a requirement relates to execution of the warrant and therefore is generally "imposed by statute or court rule," is "considered ministerial," and does not "flow directly"{**4 Misc 3d at 330} from the Fourth Amendment]; United States v Bonner, 808 F2d 864, 869 [1st Cir 1986] ["(c)ourts have repeatedly upheld searches conducted by law enforcement officials notified by telephone or radio once the search warrant issued"; collecting cases]; 2 W.R. LaFave, Search and Seizure § 4.12 [a], at 718 [3d ed 1996] ["prevailing view is that such exhibiting or delivering need be done only prior to post-search departure by the police, so that police advised that a search warrant has issued need not have it with them at the outset"]).[FN6]

Rule 41 is not applicable here, but CPL 690.50 (1) is applicable, and only requires the police to serve the warrant on the owner "upon request." Defendant made no such request here.
In New York, the lead case is People v Mahoney (58 NY2d 475 [1983]), which rejected a claim that "an executed but undelivered search warrant is tantamount to there being no warrant." (Id., 58 NY2d at 479.) The Court held that, "once a warrant had been issued by a neutral magistrate, physical possession of the warrant at the time of entry was not required under the facts of the case." (Id., 58 NY2d at 479.) The holding was in the Payton context, however, and only concerned the entry itself by the police into the premises before the warrant arrived, because on the facts of the case, the search later conducted (the warrant also authorized a search) did not begin until the warrant arrived. (Id., 58 NY2d at 480.) Professor LaFave treats Mahoney as stating, or adopting the "prevailing view" quoted above for the search context. (2 W.R. LaFave, supra, § 4.12 [a], at 718 n 3.) This would seem supported by the last two sentences of the opinion in Mahoney: "The entry and search in this case was authorized by a magistrate prior to the entry and search occurring. Our Federal and State Constitutions require nothing more." (People v Mahoney, 58 NY2d at 481 [emphasis added].) But the qualifying language in the opinion concerning the timing of the search as occurring after the arrival of the warrant leaves open the question whether the same result should obtain if the search begins prior to the warrant's arrival on the premises.
[*8]
The Appellate Divisions are in seeming conflict. In the latest case on the issue, People v Williams (275 AD2d 753 [2d Dept 2000]), the Court held that "[t]he fact that the police officers may not have had physical possession of the warrant at the time {**4 Misc 3d at 331}[citing Mahoney] . . . does not require the suppression of the contraband seized from the apartment." (Id., 275 AD2d at 754.) The Third Department has rendered seemingly inconsistent rulings. (Compare People v Markiewicz, 246 AD2d 914, 916 [3d Dept 1998] [warrant authorizing police search of automobile "not . . . in their possession" but issued prior to search does not require suppression, citing the passage at the end of the Mahoney opinion quoted above (58 NY2d at 480-481) and Professor LaFave's formulation of the prevailing view as quoted above (§ 4.12 [a], at 718)], with People v Okun, 135 AD2d 1064, 1065-1066 [3d Dept 1987] [suppressing evidence seized before the warrant arrived as a "warrantless search" despite prior issuance, distinguishing Mahoney].) The Fourth Department has upheld an entry into the premises after notification of issuance by telephone (citing Mahoney), but suppressed gambling records seized before the warrant arrived on site because "without the warrant in their possession the police could not know the terms of the warrant and the limitations imposed by the issuing Judge." (People v Carson, 99 AD2d 664, 665 [4th Dept 1984].) Each of these cases involve application of the federal constitutional rule; no claim was made that a separate state constitutional rule should be applied. Accordingly, to the extent they are inconsistent with United States v Banks (supra) and Groh v Ramirez (supra), they do not control the disposition of defendant's motion.
In any event, however, Sergeant Riley (who headed the search team at the apartment) knew exactly what Houlihan intended to apply for and the intended scope of the warrant that would be presented to Judge Lindley. Houlihan told him ahead of time. Moreover, there is no contention that the warrant issued by Judge Lindley varied in any aspect from what Houlihan told Riley he would seek (and for that matter from what Riley testified he understood Houlihan would seek). It was, after all, a customary and routine narcotics warrant that is used hundreds, even thousands, of times. Police on the scene are entitled to rely on what other officers tell them in the Fourth Amendment context (People v Ketcham, 93 NY2d 416, 419-420 [1999]), and that rule should extend to communications concerning the issuance and scope of a search warrant. That Riley did not actually see the warrant should not be determinative unless the issuing judge made some change in the warrant's expected terms which was not, but should have been, communicated to the search team by the affiant who ferries the warrant to the targeted premises. As stated {**4 Misc 3d at 332}above, the Fourth Amendment requires nothing more, and Mahoney demonstrates that the Court of Appeals has not created a separate or different state constitutional rule on the subject. (Cf., Commonwealth v Guaba, 417 Mass 746, 632 NE2d 1217 [1994].)[FN7]

Accordingly, the Carson case, which purported only to decide the federal constitutional issue, is distinguished, if not fully abrogated by United States v Banks and Groh v Ramirez (supra, 540 US at  n 5, 124 S Ct at 1292 n 5).
In any event, even if the failure to have the warrant in hand at the beginning of the search violated CPL 690.50 (1), suppression is not the appropriate remedy. Because the warrant was issued before Sergeant Riley's team began searching the apartment, the Fourth Amendment was satisfied. Any defect in the execution of the warrant, which would not impinge Fourth Amendment interests, should not result in suppression. (United States v Ritchie, 35 F3d at 1483 n 6; 2 W.R. LaFave, supra, § 4.12, at 717 ["it may be said that these requirements (i.e., concerning execution of search warrants which are typically provided '[b]y statute or court rule') are not deemed to flow so directly from the Fourth Amendment's proscription upon unreasonable searches that failure to abide by them compels exclusion of evidence"]; see discussion in n 1, supra.) For example, if the ministerial requirements of CPL 690.50 were not complied with, [*9]at least not in a deliberate effort to flout the law, or if prejudice to the owner/defendant occurred (in the sense that a defendant was subjected to a search that would not have occurred without the statutory violation, or would not have been so intrusive if the statute had been complied with), New York courts refuse to apply the remedy of suppression. (People v Camarre, 171 AD2d 1003 [4th Dept 1991]; People v Morgan, 162 AD2d 723 [2d Dept 1990]; People v Nelson, 144 AD2d 714 [3d Dept 1988].) Here, we do not even have a violation of the statute. The failure to have the warrant in hand at the outset of the search could only implicate the statute if defendant requested a copy thereof. (CPL 690.50 [1] ["upon request"].) Defendant makes no contention that he made such a request, nor does he claim that any other aspect of section 690.50 was not complied with. Accordingly, suppression should not result from the fact that {**4 Misc 3d at 333}the search began before Houlihan arrived at the apartment with the warrant.[FN8]

Conclusion

The motion to suppress is denied.

Footnotes

Footnote 1: It is necessary to decide whether the entry was lawful in this case only because defendant now predicates his motion to suppress Houlihan's confirmatory identification of him in the apartment prior to issuance of the warrant on the unlawfulness of the entry itself under Payton v New York (supra). In the absence of a finding that the entry and detention of the occupants was lawful, the motion to suppress both the out-of-court and in-court identifications made by Houlihan would have to be granted. (People v Gethers, 86 NY2d 159 [1995].) Except for an aspect of the execution of the warrant that defendant claims taints the search, discussed in the next section, the motion to suppress the evidence seized within the apartment may be resolved upon the finding, which is hereby made, that the warrant application was based solely on information obtained prior to the entry and also on the finding, hereby made, that the search began only after issuance. (People v Arnau, supra.)

Footnote 2: On occasion, the police in McArthur entered the premises, but only to accede to defendant's request to go inside for cigarettes and a phone call. The Court held that "the reasonableness of the greater restriction (preventing reentry) implies the reasonableness of the lesser (permitting reentry conditioned on observation)." (McArthur, 531 US at 335.)

Footnote 3: On the first aspect, the showing of probable cause here exceeded that in McArthur because the police had first-hand observation of the smorgasbord of drugs in the apartment, displayed on the coffee table for convenient selection and purchase, only minutes before. On the second aspect, the police here had just as much reason as in McArthur to fear that, unless restrained, the occupants would destroy evidence because the arrest of Johnson occurred within eyesight of those within immediately after the undercover buy. On the third aspect, entry was necessary because a perimeter stakeout or quarantine of the premises, which would be as visible to the occupants as the arrest of Johnson was, would not have prevented destruction of contraband. Any "reasonable effort to reconcile . . . law enforcement needs with the demands of personal privacy" (id. at 332) would necessarily entail, in these circumstances, an entry and detention of the occupants, who the undercover officer had personally observed selling narcotics from a large stash only minutes before. Moreover, as in McArthur, the police did not search upon entry but only detained the occupants while awaiting issuance of the search warrant. Finally, the period of restraint was reasonable in duration, beginning at 10:45 p.m. and ending, for purposes of its warrantless aspect, at 12:10 a.m. when Judge Lindley signed the warrant. This is less than the two-hour delay at issue in McArthur, and those periods of time at issue in most of the cases discussed by the Court. (Id., 531 US at 332-334.)

Footnote 4: The one dissenting justice in McArthur recognized that the case was accepted for review as a "vehicle for probing the boundaries of the government's power to limit an individual's possessory interest in his or her home pending the arrival of a search warrant." (McArthur, 531 US at 339 [Stevens, J., dissenting]; see also 3 W.R. LaFave, supra § 6.5, 2004 Pocket Part, at 98 [approving Justice Souter's formulation, quoted above, as "most sensible"]; id. § 6.5, 2004 Pocket Part, at 100 [collecting cases authorizing premises entry].) What few New York cases there are on the question are in accord. (People v Kelly, 261 AD2d 133, 133-134 [1st Dept 1999]; People v Martinez, 187 AD2d 992, 993 [4th Dept 1992]; People v De Rosa, 187 AD2d 980, 981 [4th Dept 1992].)

Footnote 5: Thus, United States v Banks and Groh v Ramirez would seem to fully abrogate United States v Gantt (194 F3d 987 [9th Cir 1999]), which is one of the only cases, besides Okun and Carson (cited by defendant), to hold to the contrary. In any event, Gantt's holding involved rule 41 only, not the Fourth Amendment, and the court in Gantt acknowledged that suppression would not be required unless there was deliberate disregard of rule 41's requirements or the defendant was prejudiced. (Id., 194 F3d at 994-995.) Prejudice in this context would mean that the defendant was subjected to a search that might not have occurred without the rule 41 violation, or would not have been so intrusive if rule 41 had been followed. (United States v Burke, 517 F2d 377, 386 [2d Cir 1975]; see also, United States v Bonner, 808 F2d 864, 869 [1st Cir 1986]; United States v Triumph Capital Group, Inc., 211 FRD 31, 65-66 [D Conn 2002].)

Footnote 6: In view of Groh v Ramirez (540 US 551,  n 5, 124 S Ct 1284, 1292 n 5 [2004]), the discussion in the 2004 Pocket Part of 2 W.R. LaFave (supra at 157 n 3.1) would no longer be apt.

Footnote 7: It would be wholly inappropriate for this court, at nisi prius, to create a separate state constitutional rule. (People v Payne, 1 Misc 3d 909[A], 2004 NY Slip Op 50010[U] [Sup Ct, Kings County 2004]; People v Janick, 186 Misc 2d 1, 7-8 n 3 [Sup Ct, Monroe County 2000] [collecting cases].)

Footnote 8: This disposition renders it unnecessary to reach the question whether the People are precluded from having received into evidence Sergeant Riley's testimony during the offer of proof, and the testimony of two other officers on the timing of the discovery of the noncocaine evidence, under the rule of People v Havelka (45 NY2d 636 [1978]) and People v Serrano (93 NY2d 73 [1999]). The People have submitted cases which distinguish Havelka on the ground that a determination on the merits had not yet been made when the application to reopen occurred. (People v Colon, 228 AD2d 449 [2d Dept 1996]; People v Torres, 257 AD2d 672 [2d Dept 1999].) I do not see that that distinction finds expression in the Court of Appeals cases on the subject, so I decline to reach the issue, and indeed do not have to reach it in light of the foregoing.