UNITED STATES of America

v.

**Michael BROWN and Tyquan Midyett, Defendants.**

No. 07–CR–874 (KAM).

United States District Court, E.D. New York.

Feb. 3, 2009.

David Bitkower, United States Attorneys Office, Eastern District of New York, Brooklyn, NY, for Plaintiff.

John F. Kaley, Doar Rieck & Mack, Joel S. Cohen, Joel S. Cohen, P.C., New York, NY, for Defendants.

## MEMORANDUM & ORDER

KIYO A. MATSUMOTO, District Judge:

### I. BACKGROUND

Defendants Michael Brown and Tyquan Midyett move to suppress property and contraband recovered during a search by the New York Police Department (NYPD) of Brown's apartment and its occupants in the Marcy Housing Project, at 125 Nostrand Avenue, Apartment 2A, in Brooklyn, New York (Apartment 2A), on January 9, 2007, and Brown's post-arrest statements. Defendants are charged in a seventeen-count indictment with conspiracy to possess with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1), possessing with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1), and possessing with intent to distribute cocaine base in a school zone and in public housing in violation of 21 U.S.C. § 860. Defendant Brown is also charged with using and carrying a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c). Midyett is also charged with being a convicted felon in possession

of a firearm in violation of 18 U.S.C. § 922(g)(1).

### 1. *The Motions to Suppress*

#### A. Brown's Motion to Suppress

Brown filed a motion dated August 6, 2008 (Doc. 124) to suppress the following physical evidence recovered during a search of Apartment 2A: (1) .22 caliber revolver and ammunition, (2) 27 vials of crack cocaine seized from a shelf in a closet in or near the kitchen, (3) two cellular telephones, and (4) $122.35 in cash, and statements that Brown made after his arrest. Brown "does not contend that his [post arrest] statement at the precinct was involuntarily made but ... contend[s] that it should be suppressed as the fruit of an illegal arrest and search." (Doc. 124, Attach. 1, Brown Mem. at 3.)

Brown's affidavit (Doc. 124, Attach. 2, Brown Aff.) in support of his motion states that on January 9, 2007, he was residing at Apartment 2A (*Id.* ¶ 2), that at approximately 1:00 p.m. an officer knocked on the door of Apartment 2A, pointed what appeared to be an assault rifle, yelled, "everybody down," struck an individual named Daquan Cassidy with the rifle, and with "several police officers in the hallway behind the officer with the rifle," pulled individuals out of the apartment into the hallway where they were handcuffed. According to Brown's affidavit, officers then entered Apartment 2A and began searching the apartment, and announced that "everything is clean, we didn't find anything." (*Id.* ¶¶ 3–8.) Brown's affidavit also states that another officer was sent into Apartment 2A and, subsequently, officers reported that they found a gun and other contraband. Brown denies that he or anyone in the apartment consented to the search of Apartment 2A. (*Id.* ¶¶ 9–11.)

In his initial submission, Brown contended that the physical evidence seized from his apartment and its occupants must be suppressed as a product of a warrantless search of his home. Brown further contended that although officers claimed to have seen an individual throw a plastic bag containing vials of crack out of the window of Apartment 2A, exigent circumstances did not exist and thus did not justify the warrantless search. Brown also asserted that the police did not obtain the consent of the tenant of Apartment 2A for the search. (Brown Mem. at 4.)

Following the government's August 29, 2008 submissions in opposition to Brown's motion, in which the government asserted that a valid search warrant for Apartment 2A and exigent circumstances authorized the search of Brown's apartment, the defendants were invited to make additional submissions. Brown contended in subsequent submissions (doc. nos. 155, 158, 229), that the search of Apartment 2A was not pursuant to a warrant because the officer directing the search did not know about the warrant or sufficient details about the warrant, did not have the warrant in hand at the time of the search, did not communicate the existence of the warrant to the officers conducting the search and that exigent circumstances did not exist.

#### B. Midyett's Motion to Suppress

In a letter dated August 10, 2008 (Doc. 126), defendant Midyett joined "in all respects" Brown's motion to suppress "all items recovered form [sic] the scene and locus of the arrest," and "all items seized from the person of Mr. Midyett." Midyett subsequently submitted an affidavit dated September 10, 2008 (Doc. 147, Midyett Aff.), in which he stated that he was in Apartment 2A on January 9, 2007 "visiting a legal resident of the premises," was not engaged in illegal activity and did not observe any of the occupants of the premises engaged in any illegal activity. (*Id.* ¶¶ 1–3.) Midyett's affidavit further states that

"without cause, reason or permission," law enforcement officials entered Apartment 2A and conducted an extensive search of the premises and the persons located within, and that during the search of his person, United States currency and "other personal property" were taken from him. (*Id.* ¶ 5.) Midyett requested that the court conduct a pretrial evidentiary hearing "to assess and review the legality of the search of the said premises and that of my person." (*Id.* ¶ 6.)

By letter dated October 12, 2008 (Doc. 156), Midyett provided legal authority in support of his assertion that he had a protected privacy interest as an invited guest to Brown's residence in Apartment 2A and, thus, had standing to challenge the search and seizures. Thereafter, on November 20, 2008, Midyett's new counsel, John Burke, Esq., submitted an additional affirmation and memorandum of law (Doc. 176, Burke Aff. and Midyett Mem.) in support of Midyett's motion to suppress the evidence seized in Apartment 2A, and specifically asserted that Midyett had standing to request a suppression hearing regarding $1,700 seized by the police "from a place where [Midyett] has a reasonable expectation of privacy, his pants pocket." Midyett also asserted that the affidavit in support of the search warrant and the search warrant for Apartment 2A indicate that only one person, not Tyquan Midyett, should be searched. (Midyett Mem. at 2.)

### C. Government Opposition to Defendants' Motions

In a memorandum of law dated August 29, 2008 (doc. 139, Gov. Mem.), the government opposed the defendants' motion, asserting that at the time of the search on January 9, 2007, there was a valid search warrant for Apartment 2A, signed on January 3, 2007, authorizing, within ten days of the date of issuance, "any police officer in the city of New York" to search Brown

and his apartment for drugs, drug paraphernalia and other related evidence during the hours of 6:00 a.m. and 9:00 p.m. The government asserted that the search conducted by the NYPD complied with and was authorized by the warrant. (Gov. Mem. at 6–9.)

The government alternatively asserted that the search of Apartment 2A was justified by exigent circumstances which arose when the NYPD observed an individual throw a plastic bag containing vials of crack cocaine from a window of Apartment 2A, while a search warrant was being executed for Apartment 3B, on January 9, 2007. Upon entering Apartment 2A, according to the government, officers of the NYPD Emergency Services Unit (ESU) conducting a security sweep observed in plain view the hand gun and vials of crack cocaine that matched the vials that the NYPD observed being thrown from the window of Apartment 2A. (*Id.* at 10–17.)

The government opposed Brown's motion to suppress his "spontaneous" post arrest statements at the police station and his *Mirandized* statements, asserting that because the search was lawful, the statements cannot be suppressed as fruit of the poisonous tree. (*Id.* at 18; Exhibit D thereto, *Miranda* Warnings signed by Brown and handwritten statement signed by Brown.) The government also contested Midyett's standing to challenge the legality of the search of Brown's apartment because he failed to demonstrate any legally cognizable privacy interest in the place searched or items seized. (*Id.* at 19–21.)

### 2. *The Hearing*

The court conducted a suppression hearing on January 7, 2009. The government presented testimony from NYPD Detective Karyn Lang, who works in the Special Projects Unit of the Narcotics Division, which writes search warrants and keeps

copies of special narcotics court search warrants; NYPD Captain Brian McGinn, who directed the searches on January 9, 2007 by the Housing Bureau Public Service Area 3 (PSA–3), which covers all housing developments in Brooklyn North; NYPD Detectives Rene Samaniego and Giovanni Wilson, who were assigned to the Anti–Crime Unit in PSA–3 and participated in the search of Apartment 2A on January 9, 2007. Defendant Brown presented testimony by Everett Grant, a private investigator for Jay Salpeter Associates, who was retained to take photographs of the exterior of the building at 125 Nostrand Avenue.

## A. Detective Lang

Detective Lang testified that the Special Projects Unit drafts search warrants for review by a bureau chief or deputy bureau chief, which are then presented by an investigator to the Special Narcotics Court to be reviewed and signed. After the search warrant is signed, the original warrant and supporting affidavit are kept in a locked file cabinet in the Special Projects Unit and a copy of the warrant is given to the investigating officer who signed the warrant application. (Tr. 3–4, 7–12) [1]

Detective Lang testified that prior to testifying at the suppression hearing, she reviewed the original search warrant 0014–2007 for Apartment 2A of 125 Nostrand Avenue, Brooklyn, New York (Gov. Ex. 1), signed by Judge Anthony Ferrara on January 3, 2007, and the supporting affidavit (Gov. Ex. 2, Tr. 5–8). The warrant authorizes "Any Police Officer in the City Of New York" to search Apartment 2A and an individual known as JD Littleman for "evidence of the possession of narcotics and the means of committing a narcotics crime," including but not limited to:

a. crack/cocaine, vials, caps, glassine envelopes, small ziplock-style bags, and other evidence of the possession and distribution of crack/cocaine, including but not limited to paraphernalia used to process and distribute drugs, including but not limited to dilutants and scales, counter-surveillance equipment, and records and documents reflecting drug transactions.

b. Currency and other evidence of proceeds from drug trafficking, including but not limited to financial records in any format, tending to demonstrate cash transactions or financial transfers derived from the possession of cash currency, money orders, bank receipts, stocks, bonds, bills and receipts for goods and services, documents relating to real estate holdings, and any title or registration to motor vehicles;

c. evidence of ownership and use of the target premises, or the use of property located therein by any person, including but not limited to keys, telephone bills, utility bills, bank statements, leases, deeds, or rent receipts related to the target premises, identification bearing the name or photograph of any person, telephone books, address books, date books, calendars, personal papers, and videotapes and photographs of persons.

The warrant further provides that it may be executed "without prior notice of authority or purpose," during the hours of 6:00 a.m. and 9:00 p.m., and that it must be executed within ten days of January 3, 2007. (Gov. Ex. 1 at 1–2.)

1. The transcript of the suppression hearing and arguments regarding the January 9, 2007 search of Apartment 2A is referred to as "Tr."

## B. Captain McGinn

Captain McGinn testified credibly as follows. Captain McGinn has been an officer with the NYPD for twenty-one years and has been assigned to the Housing Bureau, PSA–3 for two and a half years. Prior to his assignment as a captain at PSA–3, Captain McGinn was assigned as a captain in PSA–1, a lieutenant in Brooklyn South narcotics, a lieutenant in the 70th and 67th precincts and a sergeant in Brooklyn South narcotics. (Tr. 13.)

On January 9, 2007, Captain McGinn was supervising a warrant execution for Apartment 3B, at 125 Nostrand Avenue, the same building as Brown's apartment, Apartment 2A. Captain McGinn had learned of the search warrant for Apartment 2A for crack cocaine a few days prior to January 9, 2007, from his frequent, at least weekly, discussions with members of the narcotics division. Captain McGinn had frequent discussions with the narcotics division and Captain Mike Ameri because Captain McGinn was in charge of and had to be informed of all narcotics division search warrants and crimes in all housing developments in the area. Captain McGinn did not know when the search warrant for Apartment 2A was issued or who told him about the warrant, and did not recall being told that the warrant authorized the search of a person; he did not see the warrant. Captain McGinn knew that the search warrant for Apartment 2A was for crack cocaine but did not recall other particulars of the warrant. He informed the narcotics officer that his division was executing a search warrant for Apartment 3B on January 9, 2007. The narcotics division officer informed Captain McGinn that the unit intended to execute the warrant for Apartment 2A at a later date. (Tr. 13–15, 25–26, 28, 49–50, 53). Captain McGinn did not report to his supervisor or a narcotics division supervisor that someone from the narcotics division declined to coordinate or cooperate with him in the execution of a search warrant. (Tr. 26).

On the morning of January 9, 2007, Captain McGinn's unit had a tactical ("TAC") meeting to discuss the procedures and tactical aspects of the execution of the search warrant for Apartment 3B, safety procedures, each officer's location and role, and coordination with ESU. ESU is like a Special Weapons and Tactics (SWAT) team that is responsible for executing search warrants by taking down the door, tactically entering the place to be searched and securing it, and handcuffing the occupants so that Captain McGinn's unit can enter and conduct the actual search. A written TAC plan listing each officer's assigned responsibilities was approved by Captain McGinn and discussed at the TAC meeting. (Tr. 16–17, 30). According to Captain McGinn, in addition to the responsibilities on the TAC plan, each officer is required to watch the building in which the warrant is being executed to ensure that wherever they are standing, people at the location are safe and secure, because weapons and perpetrators could exit the building from windows, as has happened "numerous times in the past." (Tr. 16–17).

After the TAC meeting, Captain McGinn and approximately ten PSA–3 officers proceeded in a convoy of approximately five vehicles and, along with approximately seven ESU officers, arrived at approximately 1:00 p.m. at 125 Nostrand Avenue. Someone on Captain McGinn's team had the search warrant for Apartment 3B. Captain McGinn had seen the search warrant for Apartment 3B but had not read the entire warrant. The PSA–3 officers secured the area outside the building while ESU executed the search warrant. The ESU team was wearing helmets and cus-

tomarily carries shields and rams for the door, although Captain McGinn does not recall if ESU carried rams that day.[2] Captain McGinn stationed himself in a parking lot outside of the line of "A" apartments designated on a map showing the layout of Apartments A–D at 125 Nostrand Avenue (Government's Exhibit 4), where Captain McGinn could get the best view of his officers outside the building while ESU entered the building. (Tr. 17–19, 41–43, 46, 58–59.) From his location, Captain McGinn could see the windows of Apartment 3B that faced west toward the parking lot, but he could not see the north or east facing windows of Apartment 3B. (Tr. 32–33). Captain McGinn stationed officers all around the 125 Nostrand Avenue building except on the far east side of the building. He could see most of his officers on the north, west and south sides of the building, but he could not see the officers stationed near the entrance on the north side of the building, although he could hear them. (Tr. 33–34).

Captain McGinn heard ESU enter Apartment 3B, a "loud commotion," with "officers screaming 'search warrant.' " He next heard one of his officers screaming that a gun was being pointed out of one of the windows of Apartment 3B, and Captain McGinn screamed at his officers to take cover as he drew his weapon, moved around to the front of the building, entered the building and ran up the stairs to the third floor. Upon Captain McGinn's arrival at Apartment 3B, ESU had completed their entry into and secured Apartment 3B, with one person in handcuffs, and the officers in PSA–3 were then able to enter and conduct a search. (Tr. 20–21, 44.)

Within a minute or two after Captain McGinn entered the building in response to the report of a gun being pointed out of a window of Apartment 3B, he was informed "that crack cocaine came out of the window of Apartment 2A." Captain McGinn, members of ESU and a law enforcement agent went down to the second floor. Captain McGinn knew that the narcotics division had obtained a search warrant for Apartment 2A so "it was up to [him] if we were going to gain entry." He told ESU that there was a search warrant for Apartment 2A, but directed "ESU to knock on the door, if we get consent to go in, we'll go, if we don't, we'll wait for the search warrant in hand and do it tactically, the way it's supposed to be done." (Tr. 21–23, 44, 55.)

Captain McGinn testified that they did not wait for the search warrant because a member of ESU knocked on the door, spoke to somebody at the front door who let them in, and that "it was not a forcible entry, they let us in, ESU went in and secured the apartment and then we went in." (Tr. 22.) Captain McGinn testified that it was not necessary to have the search warrant in hand, based on eight years of supervisory experience in the narcotics division and his involvement in executing hundreds of search warrants, some of which were executed without the search warrant in hand, but thought it was better and safer to obtain consent to enter the premises to be searched. The reasons for Captain McGinn's decision to search Apartment 2A without the warrant in hand were twofold: he knew that a search warrant existed for Apartment 2A and he

---

**2.** Captain McGinn testified that ESU wears shields in case there is an exchange of gunfire when they make a forcible entry or inside an apartment, and use rams or hydraulic tools to open the front door if they do not obtain consent. He further explained that ESU carries special weapons other than standard issue because "they are a lot more frequently to be engaged in firearms battles" when entering premises forcibly to execute a search warrant. (Tr. 56–57.)

knew that drugs had come out of a window of Apartment 2A. (Tr. 23.)

Captain McGinn observed ESU knock on the door of Apartment 2A, the door open, a discussion between ESU and the person who opened the door, and then observed ESU enter the apartment, but he does not know if consent to enter was given. Captain McGinn does not know if the ESU team had their weapons drawn when ESU knocked on the door. Captain McGinn observed ESU walk into Apartment 2A but did not observe or hear what ESU did or said inside. (Tr. 38–39, 46–47.) He entered Apartment 2A after ESU arrested seven people in the apartment for the crack cocaine that came out of the window, and drugs and a firearm that were inside the apartment.[3] ESU did not communicate with Captain McGinn as they were arresting individuals and bringing them out of the apartment. After Apartment 2A was secured by ESU and the occupants were placed in handcuffs in the hallway and entry of the apartment, Captain McGinn directed his sergeant to have his officers conduct a thorough search of the apartment. Captain McGinn was not exactly sure when or where he learned of the firearm and additional drugs found in Apartment 2A, but thought it was after he authorized the full search of the apartment. Captain McGinn did not know where the firearm and drugs were found in Apartment 2A. Captain McGinn thought that Apartment 2A had two bedrooms, but was "not 100 percent sure," and thought that the kitchen was toward the front of the apartment. He did not observe the search of Apartment 2A because he left a minute or two after he directed his officers

to search the apartment. (Tr. 24, 35–36, 38, 40–41, 48–49, 54.)

Captain McGinn did not know and had never seen Tyquan Midyett before the search on January 9, 2007. He authorized the arrest of the individuals in the apartment. (Tr. 51).

### C. Detective Samaniego

Detective Rene Samaniego testified that he has been employed by the NYPD for approximately eight years and, at the time of the search of Apartment 2A on January 9, 2007, he had been assigned to PSA–3 for approximately six years (Tr. 61–62). He attended a TAC meeting with PSA–3 on the morning of January 9, 2007, to discuss the execution of a search warrant for Apartment 3B at 125 Nostrand Avenue. While ESU conducted the entry and security sweep of Apartment 3B, Detective Samaniego and his team were assigned to the outside security of the 125 Nostrand Avenue building to ensure that evidence and perpetrators did not exit from the windows. (Tr. 62–63).

Detective Samaniego was assigned to the outside area around Apartment 2A (which he described as a location above the "d" of the word "Nostrand" on Government's Exhibit 4, a floor plan of the building which he had seen at the TAC meeting earlier on the morning of January 9, 2007), inside a fenced area and below the south facing windows of Apartment 2A, as depicted in Government Ex. 8. (Tr. 64–67). From where he was assigned outside of the "A" windows of the 125 Nostrand Avenue building, Detective Samaniego believed that "all the windows [on the third floor] were Apartment 3B because our su-

---

**3.** On cross examination, Captain McGinn testified that ESU arrested the occupants of Apartment 2A immediately after entering Apartment 2A, and that he ordered the arrest of the occupants based on information he received that drugs had been throw out of the window of the apartment, but it is not clear from Captain McGinn's testimony on cross examination whether the drugs and gun found in Apartment 2A also factored into Captain McGinn's decision to order the arrest of the occupants. (Tr. 37, 40.)

pervising officer told us to watch the windows and told me to stand there." Thus, despite the fact that he looked at the floor plan of 125 Nostrand Avenue earlier that morning, Detective Samaniego mistakenly thought that he was looking at the windows of Apartment 3B from where he stood. (Tr. 67–68.)

After ESU entered the building, Detective Samaniego credibly testified as follows. Detective Samaniego heard loud "booming" noises and heard his partner, Detective Giovanni Wilson, who was "situated in front of the building, toward the entrance" yell "gun," at which point Detective Samaniego left his original position outside the "A" line of apartments, and ran approximately 65 feet to the front of the building. Detective Samaniego pointed out on Gov. Exhibit 4, the "front" of the 125 Nostrand Avenue building where his partner was positioned, on the north side of the building where the "B" line of apartments are depicted. (Gov. Ex. 4; Tr. 68–71.) Detective Samaniego marked Government Exhibit 4A with an "X" where he was originally stationed outside the "A" line of apartments and, upon hearing his partner yell "gun," Detective Samaniego marked with a dotted line ending with an "O" his movement from his original station to where he observed the gun coming out of the window of Apartment 3B, at the front of the building, which he marked with the letter "F." Detective Samaniego left his assigned post because he heard his partner yell "gun" and he was concerned that there wasn't sufficient cover for his partner and he felt his partner was in danger and wanted to protect him. Detective Samaniego testified, "As soon as I ran it was almost immediate I saw a hand holding a silver firearm and just letting go and the silver firearm fell down to the ground," from the third floor windows depicted in Government Exhibit 5. As soon as Detective Samaniego observed the fire-

arm drop from the window, and saw that his partner was all right, he felt there would be no further danger and he returned to his original station. (Gov. Ex. 4A; Tr. 72–75.) Detective Samaniego testified that the time between hearing the booming sound when ESU entered Apartment 3B and seeing the gun drop from Apartment 3B, was approximately 15–20 seconds. (Tr. 75–76.) Detective Samaniego explained that he did not write in his memo book the time he saw the gun come out of the window of the third floor window because he did not feel it was important, given that he later retrieved the gun and found it to be unloaded. He did not immediately retrieve the gun because ESU was still inside Apartment 3B and his team had not been given the "all clear" so there was still a possibility that suspects and evidence were inside the apartment. Detective Samaniego returned to his original location after observing the handgun come out of the third floor window and did not retrieve the gun because his partner was closer to that location. (Tr. 76–77, 118.)

After returning to his original position, indicated by an "X" on Government Exhibit 4A, Detective Samaniego observed a small window on the second floor slide open and "observed a female throw a plastic bag with objects inside and some loose plastic vials with gray tops." The window from which Detective Samaniego observed the plastic bag containing drugs being thrown is depicted in Government Ex. 8 as the small middle window on the second floor. (Tr. 77–78.) Detective Samaniego knew that the drugs he saw being thrown from the second floor window came from Apartment 2A because he could see markings on the building with an "A" at the bottom. (Tr. 79.) Detective Samaniego testified on direct and admitted on cross examination that on January 9, 2007, he mistakenly thought that, in addition to the

third floor window from which he observed the handgun being dropped, the windows of the apartment above him at his assigned location also belonged to Apartment 3B, even though he was familiar with the layout (but not the interiors) of the third floor apartments at 125 Nostrand Avenue. Detective Samaniego's mistaken belief that the windows of Apartment 3B extended from the front of the building on the north side, around to the west side above Apartment 2A where he was originally stationed, resulted in testimony before the state grand jury which he admitted was based on his mistaken belief regarding the extent of the windows of Apartment 3B. (Tr. 68, 79, 93–94, 99, 101–102, 104.) Despite Detective Samaniego's incorrect understanding that the windows of Apartment 3B extended to the location above Apartment 2A where he was assigned, and his confusion about which side of the building was the west or east side,[4] he admitted to his mistaken belief and confusion at the suppression hearing. The court finds credible Detective Samaniego's testimony regarding his observations of the gun being dropped from the window of Apartment 3B on the north side after he ran from his assigned post to the northwest corner of the building, and his subsequent observation after he returned to his original location of a plastic bag containing drugs and gray topped vials being thrown from the second story middle window of Apartment 2A, as depicted on Government's Exhibit 6.

Upon observing the plastic bag of drugs being thrown from the window of Apartment 2A, Detective Samaniego notified his supervisor, Sergeant Charleston. As Detective Samaniego went to retrieve the drugs, Detective Samaniego was directed not to do so until the "all clear" was heard over the radio. The bag thrown from the second floor window contained seventy vials of crack cocaine with gray tops. (Tr. 81–82, 84–85.) Detective Samaniego learned that the drugs had been thrown from Apartment 2A when he retrieved the drugs and saw an "A" marked on the wall of the building and when he went upstairs and saw that NYPD officers had entered Apartment 2A. (Tr. 109.)

ESU had previously entered Apartment 2A to look for people who might be hiding in the apartment. Detective Samaniego assisted with searching and bringing the handcuffed occupants outside Apartment 2A down to a police van for transport to PSA–3. Before Detective Samaniego assisted with bringing the occupants downstairs to the police van, a member of the ESU team escorted Detective Samaniego to the kitchen closet and pointed to the gun and bag of drugs on the shelf, and told him that that they were in "plain view." However, Detective Samaniego does not know what ESU saw when ESU first entered Apartment 2A. When Detective Samaniego returned to Apartment 2A, an ESU team member told him there was a small revolver and ziplock bag containing plastic crack vials with gray tops in the apartment. (Tr. 82, 111–112, 123–124.) Detective Samaniego was instructed by his sergeant to search Apartment 2A. (Tr. 86.)

Detective Samaniego testified that the kitchen is located at the entry of Apartment 2A, to the right of the entry, and that he did not know if the kitchen closet door was opened or closed when ESU entered Apartment 2A. In a kitchen pantry closet with an open door, on a shelf located at eye level, Detective Samaniego saw lying next to each other the handgun and ziplock bag containing twenty-seven plastic vials of crack cocaine with gray tops that matched the vials that were thrown from

---

**4.** The court notes that defendant's witness, Mr. Grant, was also confused about the directions that apartment windows faced at 125 Nostrand Avenue.

the window of Apartment 2A. After he secured those items as evidence, he continued to search the Apartment for contraband and weapons. (Tr. 83–85, 122–123.)

Detective Samaniego did not know or see defendant Midyett before January 9, 2007 and did not search him or escort him to the police van after his arrest. (Tr. 120.)

## D. Detective Wilson

Detective Giovanni Wilson, who has been employed by the NYPD for eight years, testified that he was assigned to PSA3 on January 9, 2007 and at the time he testified. The court finds the following testimony by Detective Wilson to be credible. At the tactical plan meeting on January 9, 2007 to discuss the execution of the search warrant for Apartment 3B, Detective Wilson was assigned to maintain security at the front of the building below the north windows of Apartment 3B, to see if any contraband or individuals exited from the windows. Detective Wilson confirmed that Government Ex. 5 accurately depicts the front of 125 Nostrand Avenue from his assigned position. (Tr. 126–128, 141–143.) About thirty seconds after he heard ESU enter Apartment 3B, he saw an individual at the left window of the third floor on Government's Ex. 5, who appeared to be attempting to throw a silver firearm out of the window, but who was having difficulty because of the child gates on the windows. Detective Wilson drew his weapon and then the gun was dropped from the third floor window on the right side of Government Ex. 5. (Tr. 129–130.) During this time, Detective Wilson testified that he would not have seen Detective Samaniego run from his assigned location to the front of the apartment building because Detective Wilson's "focus was on the windows, the person pointing the gun at me." (Tr. 147).

Approximately 45 seconds later, Detective Wilson heard Detective Samaniego "calling that stuff was coming out of the window" of the second floor where Detective Samaniego was positioned. Thereafter, Detective Wilson went to the location where Detective Samaniego was stationed and saw crack on the grass below. (Tr. 129–130.) Although on cross examination, Detective Wilson conceded that he may have gotten the color wrong when he wrote in his memo book that he saw two brown bags of crack outside the window of Apartment 2A, the court credits Detective Wilson's testimony that he saw a gun being dropped out of the window of Apartment 3B and that he heard Detective Samaniego report that he saw crack being thrown from the window of a second floor apartment, later identified to be Apartment 2A, and saw crack on the ground below the window of Apartment 2A. (Tr. 145–46.)

Detectives Wilson and Samaniego were then called by radio to come up to the second floor and assist with searching individuals who had been arrested and handcuffed because the crack that had been thrown from the window of the apartment. Detective Wilson testified that arrested individuals are searched to voucher and safeguard the property and recover evidence. Detective Wilson identified Midyett in court at the hearing and testified that he searched Mr. Midyett and, after refreshing his recollection after reading his paperwork from that day (Gov. Ex. GW–4), recalled that he recovered currency totaling $1,743 from Mr. Midyett's person. (Tr. 131–133.) Detective also identified Mr. Brown at the hearing and after refreshing his recollection from 3500 GW–5, testified that he searched him and recovered approximately $122 from Mr. Brown. (T. 133–134.)

Detective Wilson testified that after searching the individuals, he followed Detective Samaniego into Apartment 2A, and that Detective Samaniego was having a conversation with ESU. Like Detective Samaniego, Detective Wilson testified that the kitchen is to the right of the entry (Tr. 151.) He conducted the search of Apartment 2A with Detective Samaniego but Detective Wilson did not discuss with ESU what had been found before he entered the apartment. A gun and crack were recovered from a shelf in the kitchen closet but no other additional contraband, weapons, scales or packaging materials were found. Detective Wilson did not search the closet himself. (Tr. 148, 154–156.)

Detective Wilson did not accompany Brown and Midyett back to the station, but after Detective Wilson arrived at the station, he heard Mr. Brown say that "if you let my friends go the money and drugs are mine." (Tr. 135–136.)

### E. Everett Grant

· The defense then called Everett Grant, a private investigator for Jay Salpeter Associates, who was retained by defendant Brown to take photographs of 125 Nostrand Avenue in August 2008, admitted as Brown Exhibits 1–18. Like Detective Samaniego, Mr. Grant occasionally provided confusing testimony about the direction or location of certain areas, like the parking lot and windows, in relation to 125 Nostrand Avenue. (Tr. 159–160, 162, 163–164, 165.) Mr. Grant's credible testimony established that if one were to face north from the location that Detective Samaniego identified as his assigned location, looking at the bathroom windows of Apartments 1A and 2A, one cannot see any of the windows in the "B" line of apartments. (Tr. 161, 166; Brown Exs. 3, 4.)

Mr. Grant also testified that he entered Apartment 2A and measured the distance from the windowsill of the bathroom window to the floor as 5'3". (Tr. 166–167.) In Brown Ex. 18, Mr. Grant, who is 5'10" tall, is shown in a photograph, but other than identifying himself below a window in the photograph on direct examination, he did not offer any further description of what is depicted. Mr. Grant testified that a person who is 5'4" would not be able to see out of the window depicted in Brown Ex. 18, except for the sky, and further testified that the window slides open approximately seven inches. On cross examination, Mr. Grant clarified that in Brown Ex. 18, he is depicted standing in the bathtub of Apartment 2A and that he did not observe any step stools in the bathroom when he took the photograph in August 2008 and does not know if there were any step stools on January 9, 2007. Mr. Grant also admitted that he has no firsthand knowledge of the weather or lighting conditions, or where the officers were standing or what their perspective of Apartment 2A was on January 9, 2007 while the search warrant was being executed. He testified that the kitchen is approximately three or four paces from the bathroom, that the closet near the kitchen has sliding doors and that during his August 2008 visit there were clothes hanging in the closet, although he does not know what was in the closet on January 9, 2007. (Tr. 167–171.)

### II. DISCUSSION

#### 1. *Brown's suppression motion* [5]

#### A. The search of Brown's apartment

The Fourth Amendment to the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects,

---

**5.** To the extent that Midyett joins in and adopts Brown's arguments in support of Mi-

dyett's motion to suppress, the court's discussion and rulings also apply to Midyett.

against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV.

■ The Supreme Court has long interpreted "the two Clauses of the Fourth Amendment," the Reasonableness Clause and the Warrant Clause, to indicate that warrantless searches—"searches conducted outside the judicial process without prior approval by a judge or magistrate,"—are *per se* unreasonable under the Fourth Amendment, unless they fall within one of a limited number of exceptions. *Thompson v. Louisiana,* 469 U.S. 17, 19–20, 105 S.Ct. 409, 83 L.Ed.2d 246 (1985) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). Exceptions to the *per se* rule exist because "the ultimate touchstone of the Fourth Amendment" is the reasonableness of the search or seizure at issue. *Brigham City, Utah v. Stuart,* 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). Determining whether police action is "reasonable" under the Fourth Amendment requires an objective analysis of the facts known to the police at the time of the action in question. *Id.* at 404, 126 S.Ct. 1943. The subjective motivation of the officers is irrelevant in determining the reasonableness of their actions. *Id.* (citing *Bond v. United States,* 529 U.S. 334, 338 n. 2, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000), *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), and *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).

■ When police conduct a search pursuant to a warrant, the warrant must comply with all four of the requirements of the Fourth Amendment: (1) it must be based on probable cause, (2) the probable cause must be supported by sworn testimony or an affidavit, (3) the place to be searched must be described with particularity, and (4) the evidence to be seized must be particularly described. *Groh v. Ramirez,* 540 U.S. 551, 557, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004).

■ The question before the court is whether, given the existence of the search warrant for Apartment 2A, the police acted "outside the judicial process," and therefore *per se* unreasonably within the meaning of the Fourth Amendment, when they searched Apartment 2A. Brown contends that the search of Apartment 2A was not conducted "pursuant to" a warrant for two reasons. The defendants first argue that, under *Groh,* Captain McGinn was required to have a copy of the search warrant in hand at the time the warrant was executed. Second, Brown argues that, under *Groh,* the search of Apartment 2A was illegal because Captain McGinn, not having read or heard all of the details of the search warrant, which was obtained by a different police unit, did not know all of the details in the warrant and thus could not ensure that the search complied with the warrant.[6]

---

**6.** Defendant Brown submitted a letter after the hearing was concluded (Doc. 229, Letter dated January 22, 2009), challenging the credibility of Captain McGinn's reliance on the search warrant when he searched Brown's apartment, on the ground that Captain McGinn failed to file a return of the search warrant, as required under N.Y. CPL § 690.50, which he would have been obligat-

ed to do if the search relied on the search warrant. Although Brown's letter states that "it is uncontested" that the warrant was not returned, there is no evidence in the record establishing whether or not a return was filed with the issuing court. Regardless, the court credits Captain McGinn's testimony as to his knowledge about the search warrant and its contents, and the court's credibility assess-

In support of his position, Brown relies on the Supreme Court's language in *Groh* that states, "[i]t is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted" and, where the officer conducting the search "did not have in his possession a warrant particularly describing the things he intended to seize, proceeding with the search was clearly 'unreasonable' under the Fourth Amendment." 540 U.S. at 563, 124 S.Ct. 1284. Brown thus asks the court to suppress the evidence recovered in Brown's apartment as the fruit of an illegal search. Brown is mistaken as to both of his arguments.

First, contrary to Brown's argument, the *Groh* decision explicitly recognized that, "neither the Fourth Amendment nor rule 41 of the Federal Rules of Criminal Procedure requires the executing officer to serve the warrant on the owner before commencing the search." The Court further noted, "Whether it would be unreasonable to refuse a request to furnish the warrant at the outset of the search when . . . an occupant of the premises is present

and poses no threat to the officers' safe and effective performance of their mission, is a question that this case does not present." 540 U.S. at 562 n. 5, 124 S.Ct. 1284; *see also United States v. Grubbs*, 547 U.S. 90, 98–99, 126 S.Ct. 1494, 164 L.Ed.2d 195 (2006) (*citing Groh*, 540 U.S. at 562, n. 5, 124 S.Ct. 1284). *Groh*, therefore, cannot be read to require an officer to have the search warrant in hand when conducting the search, as Brown contends. Rather, the Supreme Court in *Groh* considered whether, in a civil action under *Bivens v. Six Unknown Fed. Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), alleging constitutional violations by a federal agent, a search conducted pursuant to a warrant that failed to describe "the persons or things to be seized," violated the Fourth Amendment. The *Groh* court found that the warrant was plainly invalid on its face because it failed to describe the persons or things to be seized and thus violated the particularity requirement of the Fourth Amendment. Unlike the search warrant in *Groh*, the warrant for Apartment 2A was constitutionally suffi-

ment would not be affected if the facts showed that the warrant was never returned. The court notes that Brown has never raised CPL § 690.50 as a basis for suppression, and to the extent that his January 22, 2009 letter intends to do so, the issue is raised belatedly. In any case, New York courts do not suppress evidence for failure to comply with CPL § 690.50. *See Town of East Hampton v. Omabuild USA No. 1, Inc.*, 215 A.D.2d 746, 748, 627 N.Y.S.2d 723 (N.Y.App.Div.2d Dept.1995) ("noncompliance with these ministerial requirements would not undermine the validity of the warrant or the search"); *People v. Camarre*, 171 A.D.2d 1003, 1004, 569 N.Y.S.2d 224 (N.Y.App.Div. 4th Dept.1991) ("return requirement is ministerial and even relatively lengthy delays in complying with it will not invalidate a seizure"); *People v. Emerson*, 196 Misc.2d 716, 724–25, 766 N.Y.S.2d 482 (N.Y.Sup.Ct.2003). The Second Circuit has also held that suppression is not warranted for violations of the analogous federal stat-

ute, Fed.R.Crim.P. 41, unless the violation resulted in prejudice (meaning that a search was done where it might otherwise not have been done, or that the search "would not have been so abrasive if the Rule had been followed") or unless "there is evidence of intentional and deliberate disregard of a provision in [Rule 41]." *United States v. Burke*, 517 F.2d 377, 386–87 (2d Cir.1975). Several other circuits have also held that minor, or "ministerial," violations of Rule 41 do not require suppression of evidence. *See United States v. Stockheimer*, 807 F.2d 610, 613 (7th Cir.1986); *United States v. Harrington*, 504 F.2d 130, 134 (7th Cir.1974); *United States v. Dudek*, 530 F.2d 684, 688 (6th Cir.1976); *United States v. Marx*, 635 F.2d 436, 441 (5th Cir.1981); *United States v. Wyder*, 674 F.2d 224, 226 (4th Cir.1982). The failure of the police to properly return the warrant in this case, therefore, would not entitle Brown to suppression.

cient because it described with particularity the place to be searched (Apartment 2A of 125 Nostrand Avenue, in Brooklyn, New York) and the things to be seized (*inter alia,* crack cocaine and related paraphernalia).

■ Second, the court respectfully disagrees with defendants' argument that the search of Apartment 2A violated the constitution because Captain McGinn had not seen the search warrant and did not know all of the particulars at the time he ordered officers to search Apartment 2A. The uncontested evidence indicates that an officer from the narcotics unit told Captain McGinn, before Captain McGinn ordered the search of Apartment 2A, that the warrant authorized a search for crack cocaine inside Apartment 2A. Captain McGinn therefore had knowledge of those particulars, and told ESU about the warrant prior to the search of Apartment 2A. Moreover, it was reasonable for Captain McGinn to rely on the warrant's compliance with the other constitutional requirements, and the warrant, in fact, did comply with those other requirements.

■ Captain McGinn therefore possessed sufficient information regarding the four core Fourth Amendment requirements regarding search warrants, and the warrant, in fact, actually complied with those requirements: (1) knowledge that the NYPD obtained a search warrant for Apartment 2A, upon a judicial determination of the existence of probable cause to search (Captain McGinn's credible testimony that he was told about the search warrant for Apartment 2A of 125 Nostrand Avenue: Tr. 13–15, 25–26, 28, 49–50, 53; Gov. Ex. 1: Search warrant signed by New York Criminal Court Judge Anthony J. Ferrara on January 3, 2007, upon "proof by affidavit" of Police Officer Kevin Rogers); (2) supported by an affidavit or sworn testimony (Gov. Ex. 2: Affidavit In

Support of Search Warrant by Police Officer Kevin Rogers); (3) a particularized description of the place to be searched (Captain McGinn's credible testimony that he knew the search warrant was for Apartment 2A of 125 Nostrand Avenue: Tr. 15, 28, 53; Gov. Ex. 1: warrant describing the place to be searched as 125 Nostrand Avenue, Apartment 2A, on the second floor, Kings County, New York); and (4) a particularized description of the things to be seized (Captain McGinn's credible testimony that he knew the search warrant for Apartment 2A was for crack cocaine: Tr. 15, 28, 53; Gov. Ex. 1: warrant describes items to be seized as including, *inter alia,* crack cocaine). Consequently, Captain McGinn had sufficient information to direct a search within constitutional parameters.

■ The Supreme Court has stated that "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient," and an officer therefore may reasonably rely on the validity of the warrant. *United States v. Leon,* 468 U.S. 897, 920–21, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (creating a "good faith" exception to the exclusionary rule for evidence the police seize in reasonable reliance that a search warrant issued by a neutral magistrate is valid); *see also Whiteley v. Warden,* 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971) (stating, in the arrest warrant context, that "police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause"). An officer may rely on information from another officer that a search warrant has issued in order to begin executing that warrant by detain-

ing an occupant of the location without having seen the warrant. *See United States v. Ritchie*, 35 F.3d 1477, 1483 (10th Cir.1994).

Analyzing the objective information known to Captain McGinn at the time that he ordered the entry and search of Apartment 2A, as required by *Stuart*, 547 U.S. at 404, 126 S.Ct. 1943, Captain McGinn had been informed by a narcotics officer that a search warrant was issued, and thus, pursuant to *Whiteley* and *Ritchie*, *supra*, he behaved reasonably in relying on the search warrant having been properly issued by a neutral judicial officer upon sworn testimony that established probable cause. And, indeed, defendants have not challenged the probable cause for this search warrant, or its facial sufficiency. Captain McGinn had also been informed of the two remaining constitutional requirements for a search warrant: information about the particular place to be searched, Apartment 2A at 125 Nostrand Avenue in Brooklyn, and the particular item to be seized, crack cocaine. *See Groh*, 540 U.S. at 557, 124 S.Ct. 1284.

■ Beyond merely complying with the four core warrant requirements of the Fourth Amendment, the undisputed credible facts establish that the execution of the warrant substantially complied with the procedural restrictions contained in the body of the warrant itself: the warrant was executed in the daytime, within ten days of its issuance, by officers of the NYPD. Although the warrant authorized the officers to enter Apartment 2A without

previously announcing their authority (a "no-knock" warrant), Captain McGinn was unaware of this term. He adopted the more conservative approach to gaining entry to Apartment 2A by directing ESU officers to knock at the door and announce the NYPD's presence. This decision underscores the reasonableness of Captain McGinn's conduct in a situation in which he knew of the search warrant for crack cocaine inside Apartment 2A, but did not actually possess the warrant and thus did not know whether a no-knock entry was permitted.

Applying an objective standard in determining whether Captain McGinn's search of Apartment 2A was "pursuant to" the warrant, the court finds that because the warrant authorized the search of Apartment 2A by "any police officer in the City of New York" (Gov. Ex. 1), it is of no moment that the PSA–3 team did not obtain the search warrant for Apartment 2A, or that they did not intend to execute that warrant when they went to 125 Nostrand Avenue on January 9, 2007. Captain McGinn's knowledge of the contents of the search warrant and his reasonable reliance that the warrant was facially valid were sufficient.

■ Based upon the foregoing undisputed facts, Captain McGinn did not violate the Fourth Amendment when he directed the NYPD ESU and PSA–3 officers to enter Apartment 2A and search inside for crack cocaine, because the search of Brown's apartment was conducted "pursuant to" a valid search warrant.[7] Accord-

---

7. Because the court finds that the search of Apartment 2A was conducted pursuant to the search warrant, the court need not address the government's alternative argument that exigent circumstances justified the entry of Apartment 2A and a security search of the premises, including closets in which a person could hide. Nonetheless, the court finds that

Captain McGinn's undisputed credible testimony established that he was informed at the scene that drugs were being thrown from the window of Apartment 2A. The Second Circuit has held that exigent circumstances arise when police become aware of the destruction or disposal of narcotics, and that the police may then enter a dwelling without waiting for

ingly, the court denies Brown's motion to suppress the evidence recovered inside his apartment as a result of the search.[8]

## B. Brown's statements

■ Brown contends that his statements, as well as items recovered on his person (two cellular telephones and $122.35 in cash), were seized pursuant to an illegal search of his apartment and his subsequent arrest, and should be suppressed as "fruits of the poisonous tree." Physical evidence and statements obtained as an unattenuated result of an illegal search and arrest are subject to the exclusionary rule and cannot be used as evidence against the victim of the illegal search. *Brown v. Illinois*, 422 U.S. 590, 597–605, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (discussing *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

■ The court, however, has determined that the search of Brown's apartment was valid. The court further finds that unrefuted evidence in the record establishes that a gun and crack cocaine were found in plain view inside Brown's apartment.[9] The court denies Brown's motion to suppress evidence recovered as

a result of his arrest. Brown has not argued that the police had no probable cause to arrest him, but only that the evidence giving them probable cause was discovered as a result of an illegal search.[10] The court has rejected Brown's contention that the search was illegal. Because Brown's statements are the fruit of a valid arrest subsequent to a constitutional search, *Brown* and *Wong Sun* do not apply. There is no poisonous tree, and Brown is therefore not entitled to suppression of his statements.

## 2. *Midyett's suppression motion as to January 9, 2007*

## A. The search of Brown's apartment

■ A search may only be challenged under the Fourth Amendment by one who has a reasonable expectation of privacy in the place searched or the item seized. *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (citing *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). An individual who is a mere guest in an apartment and does not demonstrate a "degree of acceptance into the household" equal to that of an overnight guest does not have a reasonable expectation of privacy sufficient

---

a warrant and conduct a security search to locate any people within the premises. *See, e.g., United States v. Lopez*, 937 F.2d 716, 722–23 (2d Cir.1991). Exigent circumstances thus existed and justified the entry of Apartment 2A and a search of all places where a person might be located, including the closet near the kitchen.

**8.** Although Brown did not move to suppress the crack cocaine that was thrown from the bathroom window of Apartment 2A, the court notes that a defendant does not have a legitimate expectation of privacy in a package of cocaine that is thrown outside when police approach the apartment. *United States v. Arboleda*, 633 F.2d 985, 991 (2d Cir.1980) (citing *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)).

**9.** The cross examination of Samaniego established that an ESU officer told Samaniego that a gun and drugs were in plain view to the ESU officers when they searched the apartment. Tr. 111–113. For the purposes of the defendants' suppression motions, the court credits this testimony that drugs and a gun were in plain view inside the apartment when ESU entered and searched the premises.

**10.** Nowhere in Brown's motion papers did Brown claim that he was arrested without probable cause, and he did not argue so at the hearing. At the very end of oral argument, at the conclusion of the hearing, counsel for Brown described, in passing, Brown's arrest as "unlawful." Tr. 362:5–7. Counsel did not ascribe that unlawfulness to a lack of probable cause.

to make a Fourth Amendment challenge to an entry into the premises. *Carter,* 525 U.S. at 90, 119 S.Ct. 469; *United States v. Cody,* 434 F.Supp.2d 157, 165–67 (S.D.N.Y. 2006) (applying *Carter* and finding no reasonable expectation of privacy in a hotel room that the defendant visited several times and in which he allegedly engaged in an extramarital affair, but in which he never stayed overnight.)

■■■ Midyett's affidavit establishes only that he was an invited guest in Brown's home and engaged in a social visit there. Midyett relies on *United States v. Fields,* 113 F.3d 313 (2d Cir.1997) for the proposition that a mere invited guest can reasonably expect privacy in the premises they visit. The Second Circuit decided *Fields* before the Supreme Court, in *Carter,* as discussed above, held that an invited guest who did not stay overnight had no reasonable expectation of privacy in the visited premises. Although the Second Circuit has not had occasion to revisit the holding of *Fields* since *Carter* was decided, this court follows the approach of the court in *Cody* and holds that, under *Carter,* Midyett had no protected privacy interest in Brown's apartment. Midyett therefore cannot challenge the search of Apartment 2A, and the court consequently denies his motion to suppress the evidence recovered there.

## B. The search of Midyett's pockets

■■■ Midyett also seeks to suppress approximately $1,700 in cash found in his pockets when he was arrested in Apartment 2A on January 9, 2007. Midyett's expectation of privacy in his own pockets is reasonable and obvious. *See* U.S. Const. amend. IV (protecting the "right of the people to be secure in their *persons*") (emphasis added); *Terry v. Ohio,* 392 U.S. 1, 8–9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (holding that the Fourth Amendment "right to personal security" applies to a search of an individual's clothing and effects on a public street.) Nonetheless, the court denies Midyett's motion to suppress evidence discovered in his pockets following his arrest for the same reasons it rejected Brown's motion, namely, the search of Apartment 2A was conducted pursuant to a valid search warrant and was therefore not illegal. The $1,700 in cash found in Midyett's pocket was discovered in a search incident to arrest, and, like Brown, Midyett has not argued that the police had no probable cause to arrest him,[11] but rather that his arrest was based upon an illegal entry and search of Apartment 2A. The Supreme Court has long held that "a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment." *United States v. Robinson,* 414 U.S. 218, 224, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Therefore, the court denies Midyett's motion to suppress the money found on his person.

### 3. *Midyett's suppression motion as to December 10, 2007*

The court defers ruling on Midyett's suppression motion as to his December 10, 2007 arrest at this time. The court will rule on that motion in writing at a later date.

**SO ORDERED.**

---

11. At the hearing, counsel for Midyett twice made passing reference in his concluding argument to there being "no probable cause" to arrest Midyett. Tr. 362:13–14; 369:20–22. The issue is not, however, before the court because Midyett did not challenge the probable cause for his arrest anywhere in his motion papers, and the passing comments in his argument did not raise the issue in any cognizable manner.